**CHICAGO, MILWAUKEE, ST. PAUL AND PACIFIC RAILROAD COMPANY, Plaintiff,**

**Ezra Taft Benson, Secretary of Agriculture of the United States, National Livestock Producers Association, American National Cattlemen's Association, National Wool Growers Association, and Chicago Producers Commission Association, Intervening Plaintiffs,**

**v.**

**UNITED STATES of America, Interstate Commerce Commission, Spokane, Portland and Seattle Railway Company, Great Northern Railway Company, and Northern Pacific Railway Company, Defendants,**

**Oregon Electric Railway Company, Oregon Trunk Railway, Chicago and North Western Railway Company, Chicago, Burlington & Quincy Railroad Company, Chicago, Rock Island and Pacific Railroad Company, and The Minneapolis & St. Louis Railway Company, Intervening Defendants.**

**Civ. A. No. 58-C-77.**

United States District Court
E. D. Wisconsin.
March 25, 1960.

82

E. R. Eckersall, E. O. Schiewe, R. K. Merrill, Chicago, Ill., B. E. Lutterman, Seattle, Wash., R. S. Trump, Milwaukee, Wis., for plaintiff.

Charles W. Bucy, Asst. Gen. Counsel, Leonard M. Shinn, Joseph E. Quin, Attys., Office of the Gen. Counsel, U. S. Dept. of Agriculture, Washington, D. C., for intervening plaintiff, Ezra Taft Benson, Secretary of Agriculture.

Lee J. Quasey, Chicago, Ill., for intervening plaintiffs, National Livestock Producers Ass'n, American National Cattlemen's Ass'n, National Wool Growers Ass'n, and Chicago Producers Commission Ass'n.

Victor R. Hansen, Asst. Atty. Gen., James E. Kilday, Charles R. Esherick, Attys., Dept. of Justice, Washington, D. C., Edward G. Minor, U. S. Atty., Milwaukee, Wis., for defendant, United States.

Robert W. Ginnane, Gen. Counsel, C. H. Johns, Jr., Associate Gen. Counsel,

Arthur J. Cerra, Asst. Gen. Counsel, Interstate Commerce Commission, Washington, D. C., for defendant, Interstate Commerce Commission.

M. L. Countryman, Jr., G. Zan Golden, Anthony Kane, L. E. Torinus, Jr., St. Paul, Minn., John S. Best, Milwaukee, Wis., Charles A. Hart, Fletcher Rockwood, Portland, Or., for defendants, Spokane, Portland and Seattle R. Co., Great Northern R. Co., and Northern Pacific R. Co., and for intervening defendants, Oregon Electric R. Co. and Oregon Trunk R. Michael, Spohn, Best & Friedrich, Milwaukee, Wis., Hart, Rockwood, Davies, Biggs & Strayer, Portland, Or., of counsel.

E. H. Borgelt, Milwaukee, Wis., J. A. Gillen, Russell B. James, Jordan Jay Hillman, Carl McGowan, Fred O. Steadry, Thomas I. Megan, Chicago, Ill., Richard Musenbrock, Minneapolis, Minn., for intervening defendants, Chicago and North Western R. Co., Chicago, Burlington & Quincy R. Co., Chicago, Rock Island and Pacific R. Co., and Minneapolis & St. Louis R. Co. Wickham, Borgelt, Skogstad & Powell, Milwaukee, Wis., of counsel.

Before HASTINGS, Chief Judge, U. S. Court of Appeals, TEHAN, Chief Judge, and GRUBB, District Judge.

GRUBB, District Judge.

· This action was brought by the Chicago, Milwaukee, St. Paul and Pacific Railroad Company against the United States of America, the Interstate Commerce Commission, the Spokane, Portland and Seattle Railway Company, the Great Northern Railway Company, and the Northern Pacific Railway Company under 28 United States Code, Sections 1336, 1398, 2284, and 2321–2325, inclusive, to set aside and enjoin an order of the Interstate Commerce Commission dated May 10, 1957.

On February 16, 1954, the Chicago, Milwaukee, St. Paul and Pacific Railroad Company (hereinafter referred to as the "Milwaukee") filed with the Interstate Commerce Commission a complaint which, as amended, alleged that the re-

fusal of the Spokane, Portland and Seattle Railway Company (hereinafter referred to as the "S. P. & S.") to establish through routes and joint through rates in connection with the complainant applicable to freight traffic of whatsoever nature moving between points on the S. P. & S. on one hand and points throughout the United States on the other via the City of Spokane resulted in violations of Sections 1(4), 3(1), and 3(4) of the Interstate Commerce Act, 49 U.S.C.A. §§ 1(4), 3(1, 4).

The complaint then asked the Commission to require the S. P. & S. to establish through routes and joint rates via Spokane in connection with the complainant applicable to all freight traffic where such do not already exist via the aforementioned gateway on the same basis as may now or hereafter be available from and to S. P. & S. points over routes through the Spokane gateway in connection with the Great Northern Railway Company and the Northern Pacific Railway Company (hereinafter referred to collectively as the "Northern Lines" and separately as the "Great Northern" and the "Northern Pacific").

The Commission rejected the claims of the complainant and denied all of the relief sought. At page 498 of its report (300 I.C.C. 453), the Commission found:

"1. That the S. P. & S. system is operated under a common management and control with, and that its traffic policy is controlled by, the Great Northern and the Northern Pacific, and therefore must be considered as a part of the latter carrier systems.

"2. That the failure and refusal of the S. P. & S. to join in the establishment of through routes and joint rates via Spokane in connection with the Milwaukee and its connections, the same as apply via Spokane in connection with the northern lines and their connections, does not result in discrimination against the Milwaukee, nor in undue preference or prejudice between shippers or localities.

"3. That it is not shown to be necessary or desirable in the public interest, in order to provide adequate and more efficient or more economical transportation, to require the establishment of through routes and joint rates in connection with the S. P. & S. system and the Milwaukee and its connections via Spokane the same as apply in connection with the S. P. & S. system and the northern lines and their connections via Spokane."

The Commission further found that with certain limited exceptions, there are no existing through routes as that term is used in the Interstate Commerce Act in connection with the S. P. & S. and the Milwaukee via Spokane.

The S. P. & S. is a common carrier by railroad incorporated under the laws of the State of Washington. It owns all of the capital stock of the Oregon Electric Railway Company and all of the capital stock, except qualifying shares, of the Oregon Trunk Railway. Collectively the three railroads are known as the Spokane, Portland and Seattle Railway System (hereinafter referred to as the "S. P. & S. System").

The S. P. & S. System lines lie entirely within the States of Oregon and Washington, and the eastern terminus of its tracks is Spokane, Washington. At that point physical track connections with the Milwaukee, Great Northern, and Northern Pacific are available. The lines of the S. P. & S. and its subsidiaries approximate 950 miles in length. The Northern Lines each own 50 per cent of the capital stock and outstanding bonds of the S. P. & S.

The Milwaukee is a common carrier by railroad incorporated under the laws of the State of Wisconsin. It operates approximately 10,600 miles of railroad in the States of Washington, Idaho, Montana, North Dakota, South Dakota, Nebraska, Minnesota, Iowa, Missouri, Michigan, Wisconsin, Illinois, and Indiana. Generally speaking it might be said that its lines serve the Pacific Northwest on the one hand and the Middle West on the other. Although it does serve Spokane, the main line of its Pacific coast extension bypasses that point.

The Northern Pacific and the Great Northern are both common carriers by railroad and are incorporated under the laws of the States of Wisconsin and Minnesota, respectively. Each operates through the northern tier of States between the North Pacific coast on the west and Minneapolis and St. Paul and the head of the Great Lakes on the east. Spokane is on the main transcontinental routes of each of the Northern Lines.

The parties have agreed that the principal issues in this case are as follows:

1. Did the Commission err in finding and concluding that the S. P. & S. System is operated in conjunction and under a common management and control with the Northern Lines within the meaning of Section 15(4) of the Interstate Commerce Act, 49 U.S.C.A. § 15(4)?

2. Did the Commission err in finding and concluding that with certain exceptions there are no through routes between points on the S. P. & S. System on the one hand and, on the other, points throughout the United States generally east of Spokane and Canada in connection with the Milwaukee via Spokane?

3. Did the Commission err in finding and concluding that it is not necessary or desirable in the public interest in order to provide adequate and more efficient or more economic transportation to require the establishment of through routes and joint rates with reference to certain commodities in connection with the S. P. & S. System and the Milwaukee and its connections via Spokane the same as apply in connection with the S. P. & S. System and the Northern Lines and their connections via Spokane?

4. Did the Commission err in finding and concluding that the refusal of the S. P. & S. System to participate in joint rates with the Milwaukee and its connections similar to those in effect with the Northern Lines and their connections was not a violation of Sections 1(4), 3 (1), or 3(4) of the Act?

In respect to the first issue, the power of the Commission to establish through routes and joint rates under Section 15 (3) of the Interstate Commerce Act is limited by Section 15(4). The pertinent portions of these statutes read as follows:

Section 15(3): "The Commission may, and it shall whenever deemed by it to be necessary or desirable in the public interest, after full hearing upon complaint or upon its own initiative without complaint, establish through routes, joint classifications, and joint rates, fares, or charges, applicable to the transportation of passengers or property by carriers subject to this part, or by carriers by railroad subject to this part and common carriers by water subject to part III, or the maxima or minima, or maxima and minima, to be charged, and the divisions of such rates, fares, or charges as hereinafter provided, and the terms and conditions under which such through routes shall be operated. * * *"

Section 15(4): "In establishing any such through route the Commission shall not (except as provided in Section 3, and except where one of the carriers is a water line) require any carrier by railroad, without its consent, *to embrace in such route substantially less than the entire length of its railroad and of any intermediate railroad operated in conjunction and under a common management or control therewith, which lies between the termini of such proposed through route,* (a) unless such inclusion of lines would make the through route unreasonably long as compared with another practicable through route which could otherwise be established, or (b) unless the Commission finds that the through route proposed to be established is needed in order to provide adequate, and more efficient or more economic, transportation: * * *." (Emphasis added.)

It is the contention of the plaintiff that as the extreme eastern terminus of the lines of the S. P. & S. System is Spokane, the establishment of the through routes and joint through rates sought via that point would not deprive the S. P. & S. of any portion of its line haul, and that, therefore, the provisions of Section 15 (4) are not applicable. On the other hand, the S. P. & S. and the Northern Lines contend that the former railroad is operated in conjunction with and under the common management and control of the latter railways and that if the plaintiff prevails, the Northern Lines, in conjunction with the S. P. & S., would be "short-hauled" in contravention of the Act.

The first matter considered by the Commission in regard to the issue of common management and control was the factual relationship between the S. P. & S. and the Northern Lines. Without repeating the detailed findings of fact of the Commission (see pages 463–467 of 300 I.C.C. 453), it can be fairly stated that while neither the Northern Pacific nor the Great Northern can individually control the S. P. & S., the Northern Lines certainly can and do collectively (or jointly) control their subsidiary including its traffic policy.

The question presented then is whether joint control by two railroads over a third railroad falls within the long haul protection of Section 15(4). In this latter respect there is no question but that the language of the statute is framed in the singular, and, therefore, such a situation does not fall within the precise wording of the Act.

The plaintiff contends that such joint or collective management and control is not sufficient to invoke the long haul protection of Section 15(4) for "control" as used in that statute must be construed as complete or dominating legal control. Such a construction would, of course, limit the long haul protection of Section 15(4) to situations where a single railroad owns at least a majority of the stock of a subsidiary railroad.

In support of its contention the plaintiff points to the legislative history of the Interstate Commerce Act and specifically to the enactment of Section 1(3) (b) in 1940. This section reads as follows:

"For the purposes of sections 5, 12(1), 20, 204(a) (7), 210, 220, 304 (b), 310, and 313 of this Act, where reference is made to control (in referring to a relationship. between any person or persons and another person or persons), such reference shall be construed to include actual as well as legal control, whether maintained or exercised through or by reason of the method of or circumstances surrounding organization or operation, through or by common directors, officers, or stockholders, a voting trust or trusts, a holding or investment company or companies, or through or by any other direct or indirect means; and to include the power to exercise control."

The Congressional purpose in enacting this statute was to make applicable to specific sections of the Act the Supreme Court's interpretation in Rochester Telephone Corp. v. United States, 307 U.S. 125, 59 S.Ct. 754, 83 L.Ed. 1147, of the term "control" as used in Section 2 of the Communications Act, 47 U.S.C.A. § 152. In H.Rep. 2832, 76th Cong., 3d Sess., the joint Senate-House Conference Committee made the following comments in regard to this amendment of the Act:

"This subsection inserts in paragraph (3) of section 1 of the Interstate Commerce Act a definition of 'control' which will apply in certain specified sections of the act where that term is used in referring to a relationship between any person or persons and another person or persons. Since the term 'person' is defined to include artificial as well as natural persons, the definition of control will cover relationships between corporations, companies, associations, etc.

"The definition of control was made to apply only in the specified sections because it was thought undesirable to make any change in the interpretation of present law in certain other provisions of the act, notably section 1(1) (a) and section 15(4). The application of this definition of control will in most cases be in connection with the use in the sections to which it applied of the phrase 'controlling, controlled by, or under common control with' a carrier. This phrase has been used because it has recently had the benefit of interpretation by the Supreme Court in the case of Rochester Telephone Corporation v. United States, * * * *."

The plaintiff argues that since this broader definition of "control" was not applied to Section 15(4), Congress did not intend to extend the protection of Section 15(4) to a situation where two or more railroads jointly manage and control a third. The weakness of such a contention is (1) it is clear that Congress did not have such a situation in mind when it considered this legislation, and (2) Congress has expressly set out the reason it did not broaden the scope of the word "control" in Section 15(4).

As stated in the Committee report, Section 1(3) (b) was enacted to conform the definition of "control" as used in certain sections of the Interstate Commerce Act to the interpretation placed upon it in the Rochester Telephone Corporation decision. In that case the question considered was simply whether a single stockholder with substantial but not majority stock holdings could be said to be in control of a corporation either directly or indirectly. The situation in the present case where two railroads each own 50 per cent of the outstanding stock of a third railroad and obviously exercised joint control is not even analogous to the facts of the Rochester Telephone Corporation case.

In our opinion the significant fact in the enactment of Section 1(3) (b) is not the express exception of Section 15(4)

from the broadened definition of "control" but the reason given therefor—that Congress thought it "undesirable to make any change in the interpretation" of Section 15(4). The interpretation so referred to resides in the decisions of the Interstate Commerce Commission prior to the year 1940 which clearly show that the Commission would interpret the phrase "under a common management or control" to include a joint ownership situation such as we have in the instant case when such a case was presented to it.

In Blackshear Mfg. Co. v. Atlantic Coast Line R. Co., 87 I.C.C. 654, a rate-making case not involving Section 15(4), the following statement is found:

"It should be understood that where the term 'carriers under the same management and control' is used in this report, it refers to carriers generally controlled through ownership, lease, or otherwise to the extent of controlling traffic policy, even though separate corporate entity may be maintained."

In subsequent rate cases the Commission continued to use control of traffic policy as its criterion in judging whether railroads should be considered under the same management and control for rate-making purposes. Humbard Construction Co. v. Southern Ry. Co., 161 I.C.C. 38; Livestock To, From, and Between Points in the Southeast, 91 I.C.C. 292; Raleigh Freight Traffic Bureau v. A. C. L. R. R. Co., 107 I.C.C. 156; Justice Co. v. Holton I-U Ry. Co., 153 I.C.C. 673; Rates on Chert, Clay, Sand and Gravel Within Georgia, 197 I.C.C. 215; and Roth Blum Packing Co. v. Southern Pacific Co., 204 I.C.C. 93.

There are also a number of Interstate Commerce Commission decisions in which that body has applied the Blackshear definition of management and control to Section 15(4) cases where the long haul protection of that statute has been invoked and common management and control was an issue. Alabama T. & N. R. Corp. v. Southern Ry. Co., 148 I.C.C. 708, and Georgia & F. R. v. Atlantic Coast Line R. Co., 191 I.C.C. 489.

In addition to these cases involving Section 15(4), the Blackshear definition of management and control was also used in a case involving discrimination under Section 3(4) of the Act. Seaboard Air Line Ry. Recs. v. Carolina & Northwestern Ry. Co., 204 I.C.C. 416. Although not a Section 15(4) case, the decision is nonetheless important for the Commission recognized that retention of the long haul by railroads under common management and control as defined in the Blackshear case was not a violation of Section 3(4). The plaintiff has conceded that there can be no violation of Section 3(4) if the defendant railroads are under common management or control as prescribed in Section 15(4).

In another line of Interstate Commerce Commission decisions, the Commission has held that for rate-making purposes one railroad can be jointly managed and controlled by two other independent railroads. Russ Market Co. v. Northwestern Racific R. Co., 171 I.C.C. 117; Des Moines Union Railway Switching, 231 I.C.C. 631; Eriksen v. Ann Arbor R. R. Co., 102 I.C.C. 374; Pacific Lumber Co. v. Northwestern Pacific R. Co., 51 I.C.C. 738; and Roth Blum Packing Co. v. Southern Pacific Co., 204 I.C.C. 93.

In this respect it might also be noted that the Commission has commented in a number of decisions that the S. P. & S. for rate-making purposes must be considered as part of the Northern Lines rather than an independent railroad. Portland Chamber of Commerce v. Oregon & Nav. Co., 19 I.C.C. 265; City of Astoria v. S. P. & S., 38 I.C.C. 16; Inland Empire Shippers League v. Director General, 59 I.C.C. 321; West Coast Lumbermen's Association v. Chicago, Milwaukee, St. Paul & Pacific Railroad Co., 129 I.C.C. 363; S. P. & S. Railway Company & Oregon Trunk, 41 I.C.C. Valuation Reports 1; Pillsbury-Astoria Flour Mills Co. v. Great Northern Railway Co., 198 I.C.C. 642; and Helix Milling Co., Inc. v. Great Northern Ry. Co., 287 I.C.C. 77.

In the first case cited the Commission stated at page 283:

"So far as these proceedings are concerned, we believe this road (S. P. & S.) must properly be considered a part of the Northern Pacific and Great Northern systems rather than as an independent line. It is used by the Great Northern and Northern Pacific in the transportation of all business between coast and interior points which can be handled more cheaply over it than over the existing lines of the Great Northern or Northern Pacific."

The holdings in the above-cited Interstate Commerce Commission decisions can be. summarized as follows:

1. Control of traffic policy is tantamount to management or control in *rate cases.*

2. Two competitive railroads can jointly manage and control a third railroad by controlling traffic policy insofar as *rate cases* are concerned.

3. Control of traffic policy is also used as the definition of management or control in Section 15(4) cases.

Implicit in these holdings of the Interstate Commerce Commission are two concepts: (a) Control of traffic policy is decisive in questions of management and control, and (b) two independent railroads can jointly manage and control a third. In addition, these two concepts have been applied on two levels: (1) Rate-making cases, and (2) cases involving Section 15(4). So far the Commission has applied both concepts on the rate case level but has applied only the traffic policy control concept on the Section 15(4) level. This application of the traffic policy control concept to the Section 15(4) level has been tacitly approved by Congress because of its statement in 1940 to the effect that it did not want to interfere with the prevailing interpretation of Section 15(4).

The only remaining question then is whether Congress would also approve of the application of the second concept, i. e. joint management and control by two competitive railroads to the Section 15(4) level. Because of considerations which will be set out in detail below, this court is of the opinion that Congress did intend to cover the present situation when it used the words "under a common management or control" in Section 15(4) of the Interstate Commerce Act.

It will be noticed that the Commission has used the same test in regard to management and control, i. e. control of traffic policy in every situation it has met so far. In other words, the Commission has followed a definite pattern, and it is only reasonable to assume that Congress would expect the Commission to continue to follow this pattern in the future.

The logic of such an assumption is buttressed by the fact that both of the concepts mentioned above have been applied on the rate case level. If at this point one of these concepts is used on the Section 15(4) level and the other rejected, the consistency of the overall plan of railroad regulation would be disturbed. For example, since joint management and control is recognized on the rate case level, the subsidiaries involved in such a situation would not be allowed weak line arbitraries. Arbitraries are differentially higher rates which are allowed to so-called short or weak line railroads in addition to rate scales prescribed for general application. In Rate Structure Investigation, Part 13, Salt, 197 I.C.C. 115, 181–182, the Commission stated:

"It has been the almost uniform practice to give all of these lines, other than those that are under common control or management with some standard carrier, arbitraries in addition to the scales prescribed for general application, and the same course is here warranted."

In addition, the Commission has usually prescribed two distance scales. One is a single line rate scale for application over a single railroad or over two or more lines under the same management and control. The other is a higher joint line scale which applies when the lines

embraced in the routes were not under common management and control. In Livestock To, From, and Between Points in the Southeast, 101 I.C.C. 105, 107, the Commission stated:

" * * * we have almost invariably required lines under a common management and control to apply the single-line rates. These decisions were based on the fact that such management and control result in certain benefits in operation, and on our opinion that the single-line rates would be reasonable for application over such lines."

If the long haul of railroads in a joint management and control situation is not protected by Section 15(4), the very benefits which the Commission regards as preventing them from charging higher joint-line scales or arbitraries, i. e. the economies of joint operation, will be taken from them. Clearly, such a result would be inconsistent.

■ The obvious purpose of Section 15(4) is to allow a carrier to protect its long haul not only over its own route but over that of a closely associated affiliate. The decision of the Commission in this case is consistent with this purpose, and there has been no sound reason, economic or otherwise, advanced why two joint owners are not any less in need of long haul protection than a single railroad which controls a subsidiary.

Section 15(4) contains a provision which nullifies the long haul protection normally afforded by the statute when the Commission finds that through routes are needed in order to provide adequate and more efficient or more economical transportation. Thus, although no real reason has been put forward why joint ownership of a subsidiary plus long haul protection are inherently wrong, the Commission is always in a position by virtue of this exception to see that no one is prejudiced by such an arrangement.

Another point to be considered is the relationship of Section 3(4) of the Act to Section 15(4). The former statute deals with discrimination between railroads, and the plaintiff has conceded that if the S. P. & S. is under the common management or control of the Northern Lines within the meaning of Section 15(4), then the refusal of the S. P. & S. to accord the Milwaukee equal treatment does not constitute a violation of Section 3(4). See Atlantic Coast Line R. Co. v. Cape Fear Rys., Inc., 218 I.C.C. 152; Western Pac. R. Co. v. Northwestern Pac. R. Co., 191 I.C.C. 127; and Seaboard Air Line Ry. Recs. v. Carolina & Northwestern Ry. Co., 204 I.C.C. 416.

Viewed in the light of this relationship between the two sections, the decision in Louisville & Nashville R. Co. v. United States, 242 U.S. 60, 37 S.Ct. 61, 63, 61 L.Ed. 152, strongly supports the views of the Commission in the case at bar. In that decision which involved the use of switching facilities, the court was considering a question of discrimination under the forerunner of Section 3(4). In its opinion the court stated that if either of the joint owners of these switching facilities was the sole owner, discrimination would be impossible because the section as then constituted stated that the Act "shall not be construed as requiring any such common carrier to give the use of its tracks or terminal facilities to another carrier engaged in like business." The court then ruled that " * * * what is true of one owner would be equally true of two joint owners, * * * ." It should be noticed that this statement was made even though the literal words of the section are singular in meaning.

In the instant case there is also a situation presented where if there were only one owner there could be no possible discrimination. In the case at bar this is so because of the presence of Section 15(4). In the Louisville case it resulted from the wording of the forerunner of Section 3(4). In other words, although the reasons for the impossibility of discrimination in a single owner situ-

ation are different, the result is still the same.

Thus, if it could be said that the Louisville decision is controlling on the question of discrimination in the present case, which issue this court does not decide, however, it would seem to follow that the S. P. & S. is under the common management and control of the Northern Lines within the meaning of Section 15 (4) because of the relationship between that statute and Section 3(4). It is obvious that these sections must be read together for any inconsistency between the two would be untenable.

The plaintiff in this action has cited four Interstate Commerce Commission cases which it claims refutes the possibility of joint management and control by multiple owners. These are: Absorption of Switching Charges of Alton & S. R. R., 157 I.C.C. 129; Manufacturers Ry. Co. v. Ahnapee & W. Ry. Co., 172 I.C.C. 554; Justice Co. v. Holton I-U Ry. Co., 153 I.C.C. 673; and Oklahoma Portland Cement Co. v. Kansas City S. Ry. Co., 188 I.C.C. 464.

The first two cases, due to their very short treatment of the issue of common management and control and because of the very large number of participants, are not persuasive on this issue. The latter decisions, on the other hand, are of little or no value for the fact situations are radically different from that of the case at bar.

Based on the foregoing authority, this court is of the opinion and now holds that the Commission was correct in concluding that the S. P. & S. System is operated in conjunction and under a common management and control with the Northern Lines within the meaning of Section 15(4) of the Interstate Commerce Act.

In respect to the issues numbered 2, 3, and 4 as set out previously in this opinion, the court is of the opinion after a careful review of the record and now holds that the findings of the Commis-

sion as to these issues are supported by substantial evidence and, thus, should not be disturbed.

Injunction denied and plaintiff's complaint dismissed.