# CHICAGO, MILWAUKEE, ST. PAUL & PACIFIC RAILROAD CO. *v.* UNITED STATES ET AL.

No. 306.   Argued May 2, 1961.—Decided June 5, 1961.*

---

*Together with No. 307, *Benson, Secretary of Agriculture*, v. *United States et al.*, also on appeal from the same Court.

*Raymond K. Merrill* argued the cause for appellants in both cases. With him on the briefs for appellant in No. 306 were *Edwin R. Eckersall, Edwin O. Schiewe* and *Byron E. Lutterman.* On the briefs for appellant in No. 307 were *Carl J. Stephens, Neil Brooks* and *Donald A. Campbell.*

*Robert W. Ginnane* argued the cause for the United States et al. With him on the briefs were former *Solicitor General Rankin, Solicitor General Cox, Assistant Attorney General Loevinger, Assistant Attorney General Bicks, Richard A. Solomon* and *Charlie H. Johns, Jr.*

*Fletcher Rockwood* argued the cause for the railroad company appellees. With him on the briefs were *Marcellus L. Countryman, Jr., Anthony Kane, Louis E. Torinus, Jr., Charles A. Hart, Martin L. Cassell, Jordan J. Hillman* and *Richard Musenbrock.*

MR. JUSTICE CLARK delivered the opinion of the Court.

These are direct appeals from an order of a three-judge District Court dismissing appellants' complaint seeking to set aside an Interstate Commerce Commission decision which refused to prescribe through routes and joint rates for traffic moving between appellant railroad and the Spokane, Portland and Seattle Railway (the "S. P. & S.") system [1] via Spokane, Washington. The Commission found, contrary to appellants' contention, that, with limited exceptions, no through routes existed for the movement of freight by the S. P. & S. system and

---

[1] The S. P. & S. system is composed of the Spokane, Portland and Seattle Railway Co. and two wholly owned subsidiaries, the Oregon Trunk Railway and the Oregon Electric Railway Co.

appellant railroad (the "Milwaukee") via Spokane. It also held . that the short-haul protection provided in § 15 (4) of the Interstate Commerce Act [2] applied because the S. P. & S. was operated in conjunction with and under common management of its parents, the Great Northern Railway Co. and the Northern Pacific Railway Co. (the "Northern Lines"), each of which owned 50% of the S. P. & S. Finally, it entered a finding that the refusal of the S. P. & S. system to grant the through routes [3] and joint rates [4] requested did not result in discrimination against the Milwaukee or in undue preference or prejudice between shippers and localities and further found that they were not "needed in order to provide adequate and more efficient or more economic transportation." 300 I. C. C. 453. The District Court held that the findings of the Commission were supported by substantial evidence and affirmed its ruling as to the application of § 15 (4). 182 F. Supp. 81. We noted probable jurisdiction. 364 U. S. 860. We affirm the judgment.

The factual situation is described in detail in the Commission's report and we will, therefore, set it out only

---

[2] 49 U. S. C. § 15 (4) provides in pertinent part:

"In establishing any such through route the Commission shall not . . . require any carrier by railroad, without its consent, to embrace in such route substantially less than the entire length of its railroad and of any intermediate railroad operated in conjunction and under a common management or control therewith, which lies between the termini of such proposed through route . . . ."

[3] "A 'through route' is an arrangement, express or implied, between connecting railroads for the continuous carriage of goods from the originating point on the line of one carrier to destination on the line of another." *St. Louis Southwestern R. Co.* v. *United States,* 245 U. S. 136, 139, note 2 (1917).

[4] "[T]he essential feature of a joint rate is that connecting roads have agreed or mutually consented to carry traffic from points on one road to points on another road for an aggregate charge which is less than the sum of their local charges between the same points." *New York, N. H. & H. R. Co.* v. *Platt,* 7 I. C. C. 323, 333 (1897).

briefly. It appears that the S. P. & S. was built by the Northern Lines for the purpose of relieving congestion, avoiding double mountain trackage, and obtaining low grade road facilities to the West Coast. Its lines—approximately 950 miles in length—run along the Snake and Columbia Rivers westward between Spokane, Washington, and the Pacific Coast via Portland, Oregon. The lines of its parents, the Northern Lines, operate between Minneapolis-St. Paul, Minnesota, and the head of the Great Lakes on the east and Portland, Oregon, and coastal points in Washington on the west. They serve the larger cities in northern Idaho, Montana, North and South Dakota and Minnesota. The Milwaukee operates some 10,600 miles of line from Chicago, Illinois, and Westport, Indiana, on the east and Longview, Washington, on the west. While it serves many of the same cities in Idaho, Montana, the Dakotas and Minnesota from which the Northern Lines receive traffic, appellant railroad serves no point in Oregon directly. If it could establish through routes and joint rates with the S. P. & S. system, the Milwaukee might secure, on interchange at Spokane, much of the traffic that originates or terminates on the S. P. & S. system. On the other hand, the Northern Lines seek to obtain as much of this haul as possible and have published joint rates on all important commodities interchanged between the S. P. & S. system and the Northern Lines at Spokane. These rates are lower than the combination of the local rates of the S. P. & S. and the appellant railroad now applicable to traffic which could be interchanged at the same point, Spokane, between these carriers. It appears that the S. P. & S. system and the Northern Lines are not opposed to the publication of joint rates by the S. P. & S. system and the Milwaukee for traffic to or from points served only by the latter (local points) but refuse to establish

through routes and joint rates via appellant's line to points which are also served by the Northern Lines.

We find, as did the District Court, that substantial evidence does support the factual findings of the Commission. We shall, therefore, forego a discussion of the appellants' contentions based on the findings. We are left with only the principal issue, namely, whether the protection of § 15 (4) of the Act extends to two railroads owning a third in the relationship existing here.

The Northern Lines compete with each other but own in equal shares all of the bonds and stock of the S. P. & S. Their presidents alternate yearly as president and vice president of, and personally pass upon the executive problems of, the S. P. & S., which, however, has an operating vice president of its own. As to equipment, the Northern Lines furnish a substantial amount of the car supply of the S. P. & S. system. The traffic policies of the latter are directed and controlled jointly by the traffic departments of the Northern Lines. Transcontinental traffic matters are handled by representatives of the Northern Lines but local traffic problems—under the general policies aforementioned—are left to the S. P. & S. officials. In short, except when the Northern Lines disagree between themselves, they entirely control the operation of the S. P. & S.

Section 1 (4) of the Interstate Commerce Act requires railroads "to establish reasonable through routes" with each other. Where such routes are not established voluntarily, the Commission has the power, under § 15 (3) of the Act, to prescribe them "whenever deemed by it to be necessary or desirable in the public interest." This authority is restricted against short hauling, however, by § 15 (4) which provides that the Commission "shall not . . . require any carrier by railroad . . . to embrace in such route substantially less than the entire length of its railroad and of any intermediate railroad

operated in conjunction and under a common management or control therewith, which lies between the termini of such proposed through route . . . ." Appellants contend that since the eastern terminus of the S. P. & S. is Spokane, the establishment of the through routes via that point would not short haul the S. P. & S. If, however, the S. P. & S. is under the "common management or control" of the Northern Lines and the short-haul protection of § 15 (4) is available to them, the through routes sought would, if granted, result in the latter being short hauled in contravention of this section.

The findings of the Commission, approved by the District Court, indicate clearly that neither of the Northern Lines individually controls the S. P. & S. However, it is equally clear that jointly they do manage and control it as effectively as if it were part of their own lines. This is particularly true of its traffic policy, which is the heart of the problem here. However, appellants contend that, regardless of the factual circumstances, as a matter of law only a single railroad can operate or control another line within the meaning of the short-haul protection of § 15 (4).

The short-haul exception of § 15 (4) originated in the Mann-Elkins Act of 1910. 36 Stat. 539, 552. The crucial words "common management or control" were not defined and the subsequent legislative history of the provision is of little assistance to our inquiry. However, the overriding purpose of the Congress seems to have been the protection of the traffic of the controlling line. As Senator Elkins, a coauthor of the measure, stated to the Senate, the exception "is one which has always been recognized in the transportation business of the country. The road that initiates the freight and starts it on its movement in interstate commerce should not be required . . . to transfer its business from its own road to that of a competitor . . . when the commerce initiated by it can be as

promptly and safely transported . . . by its road as by the line of its competitor." 45 Cong. Rec. 3475–3476. The same reasoning would equally apply here. Moreover, the Senate Report on the provision emphasizes the same purpose.[5]

While the language of the section is framed in the singular, it appears to us that the reason for this exception is as valid and necessary in the case of two railroads owning a third as it is when only a single railroad and its subsidiary are involved. See *Louisville & N. R. Co.* v. *United States*, 242 U. S. 60 (1916), where this Court, in construing the discrimination provisions of the predecessor of § 3 (4) of the Act, stated, "[t]herefore, if either carrier owned and used this terminal alone it could not be found to discriminate against the Tennessee Central by merely refusing to switch for it . . . . We conceive that what is true of one owner would be equally true of two joint owners . . . ." At p. 73.

Appellants rely heavily on the fact that the Congress, in enacting the Transportation Act of 1940, broadened the definition of the term "control" in many of the sections of the Interstate Commerce Act[6] but did not do so in § 15 (4), thereby indicating an intention to restrict the scope of the exception. This definition, however, was enacted as the result of this Court's holding in *Rochester Telephone Corp.* v. *United States*, 307 U. S. 125 (1939), which gave a broad construction to "control" as used in § 2 (b) of the Communications Act. 47

---

[5] "It would seem to be unreasonable to empower the commission to require a railroad company having a line of its own between two designated termini to allow a portion only of that line to be taken and linked up with other lines for the purpose of creating another through route in competition with it, thus depriving it of the natural advantage of possessing a direct line between the termini . . . ." S. Rep. No. 355, 61st Cong., 2d Sess. 10.

[6] 49 U. S. C. § 1 (3)(b).

U. S. C. § 152 (b). It appears that the Congress decided to extend this broad definition to certain sections of the Interstate Commerce Act to insure Commission jurisdiction over persons in indirect .control of carriers. See H. R. Rep. No. 2016, 76th Cong., 3d Sess. 58. If, however, that definition were applied to § 15 (4), the opposite result would obtain and the Commission's power would be restricted, for the short-haul exception would then be afforded to carriers having only an indirect control of another line. For this reason, the Congress "thought [it] undesirable to make any change in the interpretation of present law, . . . notably . . . section 15 (4)." H. R. Rep. No. 2832, 76th Cong, 3d Sess. 63.

Apparently the phrase "operated in conjunction and under a common management or control" has received no prior judicial interpretation, as we have been unable to find any cases in point and have been referred to none by counsel. However, the decisions of the Interstate Commerce Commission support the view that control of the traffic policy of an affiliate is sufficient to constitute "control" or "management" within the meaning of § 15 (4). The Commission's conception of these terms was first expressed in a rate case, *Blackshear Mfg. Co.* v. *Atlantic Coast Line R. Co.*, 87 I. C. C. 654 (1924), in which the Commission stated that "the term 'carriers under the same management and control' . . . refers to carriers generally controlled through ownership, lease, or otherwise *to the extent of controlling traffic policy,* even though separate corporate .entity may be maintained." At p. 664. (Emphasis added.) In subsequent rate cases the Commission has continued to apply this criterion to determine whether or not lines are under the same "management" or "control." [7]

---

[7] *Rates on Chert, Clay, Sand, and Gravel,* 197 I. C. C. 215 (1933); *Humbard Construction Co.* v. *Southern R. Co.,* 161 I. C. C. 38 (1930); *Justice Co.* v. *Holton Interurban R. Co.,* 153 I. C. C. 673 (1929);

In another line of rate-making cases, the Commission has held that there can be joint management and control of a third railroad.[8]  In rate cases, the Commission generally prescribes a higher scale of distance rates for traffic moving over a combination of independent lines than it does for goods carried over a single line or over a parent-subsidiary system.   The distinction is made because the latter are expected to result in economies of operation which should be passed on to the public.  *Livestock To, From, and Between Points in the Southeast,* 101 I. C. C. 105 (1925).   For the same reason, short or "weak" lines are allowed arbitraries, *i. e.,* differentially higher rates in addition to rate scales prescribed for general application, whereas small railroads under the "management" or "control" of larger lines are not permitted the additional rates.   *Rate Structure Investigation, Part 13, Salt,* 197 I. C. C. 115 (1933).

Unless the long haul of railroads, under joint management and control as interpreted by the rate-making cases, is protected by § 15 (4), the advantages which the Commission assumed existed, *i. e.,* economies of operation, will be taken from them.   The very reasons for applying the

---

*Raleigh Freight Traffic Bureau* v. *Atlantic Coast Line R. Co.,* 107 I. C. C. 156 (1926); *Livestock To, From, and Between Points in the Southeast,* 101 I. C. C. 105 (1925); *Livestock To, From, and Between Points in the Southeast,* 91 I. C. C. 292 (1924).

[8] This group of cases is bottomed on *Chicago, M. & St. P. R. Co.* v. *Minneapolis Civic & Commerce Assn.,* 247 U. S. 490 (1918), wherein this Court found that two competitive railroads owning a subsidiary coequally did, for rate purposes, each "directly control and operate" the subsidiary and that the latter must be treated as a part of each of the two owning carriers.  See *Des Moines Union Ry. Switching,* 231 I. C. C. 631 (1939); *Blum Packing Co.* v. *Southern Pacific R. Co.,* 204 I. C. C. 93 (1934); *Russ Market Co.* v. *Northwestern Pacific R. Co.,* 171 I. C. C. 117 (1930); *Eriksen* v. *Ann Arbor R. Co.,* 102 I. C. C. 374 (1925); *Pacific Lumber Co.* v. *Northwestern Pacific R. Co.,* 51 I. C. C. 738 (1918).

higher distance rates and denying arbitraries would cease
to exist. Such a result, flowing from the failure to con-
strue § 15 (4) as including joint control, would be clearly
inconsistent with Commission policy in the rate-making
cases. Therefore, the Commission has relied upon the
same criteria in § 15 (4) cases. In *Alabama, T. & N. R.
Co.* v. *Southern R. Co.*, 148 I. C. C. 708 (1928), the
Commission specifically referred to its definition in *Black-
shear, supra,* and applied the limitation of § 15 (4) to the
three roads there involved. See also *Georgia & F. R. Co.*
v. *Atlantic Coast Line R. Co.*, 191 I. C. C. 489 (1933). In
fact, in seven separate proceedings involving the S. P.
& S.,[9] the Commission has noted that for rate-making
purposes it must be considered as part of the Northern
Lines. In one of these proceedings, *West Coast Lumber-
men's Assn.* v. *Chicago, M. & St. P. R. Co.*, 129 I. C. C.
363 (1927), joint through rates via Canada were sought
to destinations served by the Milwaukee and the North-
ern Lines. It was urged that the joint rates, if they
were prescribed, should be made over routes that would
secure the long haul of these railroads. The Commis-
sion refused to establish the joint rates via the Cana-
dian routes, holding, *inter alia,* that the S. P. & S.
"is considered for rate-making purposes a part of the
Northern Pacific and Great Northern." At p. 364.

Likewise, the case of *Seaboard Air Line R. Co.* v. *Caro-
lina & N. R. Co.*, 204 I. C. C. 416 (1934), applied
the *Blackshear* definition to discrimination cases under

---

[9] *Helix Milling Co.* v. *Great Northern R. Co.*, 287 I. C. C. 77
(1952); *Pillsbury-Astoria Flour Mills Co.* v. *Great Northern R. Co.*,
198 I. C. C. 642 (1934); *Spokane, P. & S. R. Co.*, 41 I. C. C.
Valuation Reports 1 (1932); *West Coast Lumbermen's Assn.* v.
*Chicago, M. & St. P. R. Co.*, 129 I. C. C. 363 (1927); *Inland
Empire Shippers League* v. *Director General*, 59 I. C. C. 321 (1920);
*Astoria* v. *Spokane, P. & S. R. Co.*, 38 I. C. C. (1916); *Portland
Chamber of Commerce* v. *Oregon Railroad & Navigation Co.*, 19
I. C. C. 265 (1910).

§ 3 (4) of the Act.[10]   The Commission held that under § 3 (3), the predecessor of § 3 (4), there could be no discrimination where the roads involved were under a common management and control.   The Commission found that the Carolina & Northwestern officials "determine the policy to be adopted with regard to traffic matters local to that carrier, but in matters of common interest between the Southern and the Carolina & Northwestern, the policy determined by the Southern prevails.   It is apparent, therefore, that both carriers are operated under a common management and control."   At p. 420.   Although not a § 15 (4) case, it is significant, as pointed out by the District Court, because the Commission applied the *Blackshear* test and, upon finding the roads under common management and control, permitted them to retain the long haul as protected by § 15 (4).   The interrelationship between the two sections as applied by the Commission indicates the necessity for the use of the same criteria as to control in each.

We do not consider the cases,[11] relied upon by the appellants, to the contrary.   Common management and control was not established.   They were concerned with ownership, as distinguished from control, and even that by more than two railroads.   There is nothing in these cases holding that such control cannot exist under the joint ownership and active management of two carriers. Nor do we feel that appellants' other Commission cases are apposite.

Summarizing, we find that the Commission has for many years followed the *Blackshear* criteria as to what

---

[10] 49 U. S. C. § 3 (4) provides in part that carriers "shall not discriminate in their rates, fares, and charges between connecting lines, or unduly prejudice any connecting line in the distribution of traffic that is not specifically routed by the shipper."

[11] *Manufacturers R. Co.* v. *Ahnapee & W. R. Co.*, 172 I. C. C. 554 (1931); *Absorption of Switching Charges*, 157 I. C. C. 129 (1929).

constitutes "common management" or "control." Likewise, it has since permitted such management and control to be jointly exercised by more than one railroad. We believe that the Congress took note of these cases in 1940 when it decided not "to make any change in the interpretation" of the limitation provision of § 15 (4) of the Act. The judgment is therefore

*Affirmed.*

MR. JUSTICE STEWART took no part in the consideration or decision of this case.

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BLACK concurs, dissenting.

Four lines pass through the Spokane gateway to the West Coast: The Milwaukee, the Northern Pacific, and the Great Northern, that reach Puget Sound, and the S. P. & S., that reaches Portland, Oregon. The "triangle" referred to by the Commission has its apex in Spokane and its two base points in Portland and Seattle-Tacoma. The S. P. & S. is owned 50% by the Great Northern and 50% by the Northern Pacific.

The Milwaukee is at present under a disadvantage in shipments via the Spokane gateway. The disadvantage is not in service or facilities for service, but in the rate structure. When the Milwaukee—a road that reaches to Chicago—wants to ship goods to Portland over the shortest route—the S. P. & S.—it must quote combination rates. When the Great Northern and the Northern Pacific make those shipments, they get a preferred joint rate on a through route via Spokane. The result is to "close the Spokane gateway in a commercial sense" so far as the Milwaukee is concerned. 300 I. C. C. 453, 457. The advantage which the S. P. & S. affords the Great Northern and Northern Pacific was stated by the Commission in *Portland Chamber of Commerce* v. *Oregon R.*

& N. Co., 19 I. C. C. 265, 283, "It is used by the Great Northern and Northern Pacific in the transportation of all business between coast and interior points which can be handled more cheaply over it than over the existing lines of the Great Northern or Northern Pacific." That is a monopolistic advantage; it is control over traffic which the two lines are not entitled to exploit to the exclusion of the Milwaukee.

"Through routes" are the rule, § 1 (4), and the maintenance of discriminatory "combination rates," the exception. Under the terms of § 15 (3), the Commission is to establish the former whenever "necessary or desirable in the public interest." Only in § 15 (4) do we have an exception to this policy. Since 1910, Congress has recognized a railroad's limited right not to be "short-hauled," that is, not to have to carry over its lines traffic originating on, or destined to, another line when the entire carriage could as well have taken place on its own line. Here, the Northern Lines claim that they together with the jointly owned S. P. & S. make up a single system which the Milwaukee wants to short-haul.

The question presented concerns the meaning of the words "common management or control" as they are used in § 15 (4) of the Act.

*First.* If the Great Northern and Northern Pacific are to be granted the special monopolistic protection now extended, § 15 (4) needs to be rewritten. It says that the Commission shall not "require any carrier . . . to embrace in such route substantially less than the entire length of its railroad and of any intermediate railroad operated in conjunction and under a common management or control therewith." The section is framed in the singular. When the short-haul protection was first given, the amended § 15 referred to "carrier or carriers" seven times (36 Stat. 551–553) and "line or lines" twice (36 Stat. 553). So it seems apparent that when the plural was intended, the plural

was used. Senator Elkins, in explaining the provision, spoke in the singular: *"The road* that initiates the freight and starts it on its movement in interstate commerce should not be required, where *it* is a line not unreasonably long, to transfer its business *from its own road* to that of a competitor, especially when the commerce initiated *by it* can be as promptly and safely transported from the point of shipment to the point of destination by *its road* as by the line of *its* competitor." 45 Cong. Rec. 3476. (Emphasis added.)

The Senate Report spoke of the short-haul protection as extending to a railroad "having a line of its own between two designated termini." S. Rep. No. 355, 61st Cong., 2d Sess., p. 10. While the Transportation Act of 1940 greatly expanded the meaning of "control," the new definition was not made applicable to § 15 (4) because it was thought "undesirable to make any change in the interpretation of present law" in that regard.[1] H. R. Rep. No. 2832, 76th Cong., 3d Sess., p. 63.

*Second.* Prior to the 1940 legislation the Commission had held that joint ownership by two or more railroads was not sufficient to create "common management or control" within the meaning of § 15 (4). *Absorption of Switching Charges,* 157 I. C. C. 129, 132; *Manufacturers R. Co.* v. *Ahnapee & W. R. Co.,* 172 I. C. C. 554, 564. Those two cases involved a terminal railroad jointly owned by 15 connecting roads. On oral argument counsel for the Commission conceded that those decisions are out of line with the present one. If control by 15 roads is not "common" control within the meaning of § 15 (4), I fail

---

[1] The Court admits that Congress refused to broaden the protection of § 15 (4) in 1940. Yet it seems to think this refusal of no relevance. If Congress has refused "short-haul" protection to indirectly controlled lines, is it to be lightly assumed that that protection extends to *both* owners who jointly control a third line?

to see how control by two railroads is.[2] · The other cases relied upon by the Court did not involve § 15 (4).

Cases such as *Blackshear Mfg. Co.* v. *Atlantic Coast Line R. Co.*, 87 I. C. C. 654, are irrelevant. There the Commission was concerned with what rates to fix that were "single-line" and what rates that were "joint-line." It defined "single-line rates" as those applicable over "single lines of railway or over two or more lines under the same general management and control"; and it defined "joint-line rates" as those applicable "only when the lines embraced in the route are not under common ownership or control." *Id.*, 664. It defined the term "carriers under the same management and control" as carriers "generally controlled through ownership, lease, or otherwise to the extent of controlling traffic policy, even though separate corporate entity may be maintained." *Id.*, 664. "Common ownership and control" for rate-making purposes was an innovation of the Commission, not a statutory term. The same is true of the other line of rate-making cases to which the Court refers—the ones represented by *Chicago, M. & St. P. R. Co.* v. *Minneapolis C. & C. Assn.*, 247 U. S. 490. There two railroads owning a third which in turn owned terminal tracks made no charge for use of the terminal against traffic moving over its lines

---

[2] In *Helix Milling Co.* v. *Great Northern R. Co.*, 287 I. C. C. 77, shippers wanted through routes and joint rates on the Great Northern, the Northern Pacific, and the S. P. & S. *via* the Spokane gateway. The Great Northern objected on the basis of the short-haul protection afforded by § 15 (4) of the Act. The Commission recognized that the short-haul issue was involved and made the findings as to the need for through routes on the assumption that the through routes would short-haul the objecting road. But no analysis or discussion of the present problem was made. Cf. *West Coast Lumbermen's Assn.* v. *Chicago, M. & St. P. R. Co.*, 129 I. C. C. 363, 364. It should be noted that *Alabama, T. & N. R. Co.* v. *Southern R. Co.*, 148 I. C. C. 708, 711, cited by the Court, does not involve *joint* control under § 15 (4).

but did not charge for its use by a competitor. This line of cases—like those involving "single-line" rates—is concerned with just rates and rates that are non-discriminatory. Economies of operation will not disappear merely because a carrier has competition. Of course, a monopoly position may make an affiliated short line more profitable, but I do not think that that is the sole reason for denying such short lines "arbitraries."

Section 15 (4) deals with the highly specialized problem of the short-haul. The "short-haul" protection needs to be narrowly construed, lest it too end up as a device to discriminate against competitors and foreclose them from a market. That is why, I think, it was closely confined by Congress and put in the singular not the plural and not extended to group activities of railroads such as are involved here and in the terminal cases.

I would reverse the judgment below and remand the case to the Commission for further proceedings.