Helen RYKUS et al., Appellants,

v.

NEW YORK CITY HOUSING AU-
THORITY, Appellee.

No. 2–5.

Temporary Emergency Court of Appeals.
Oct. 12, 1972.

Abraham G. Gerges, Brooklyn, N.Y., for appellants.

Gerald Davis, New York City (Otto M. Bonaparte, Louis Glickhouse, Aaron Kohn, and Jeanne Hollingsworth, New York City, on the brief), for appellee.

Before TAMM, Chief Judge, and HASTIE and ANDERSON, Judges.

ANDERSON, Judge:

The appellant, Helen Rykus, is a tenant in Pomonok Houses, a low-income housing project in Queens, New York, owned and operated by the New York City Housing Authority, a public corporation organized pursuant to New York Public Housing Law § 400 et seq., McKinney's Consol.Laws, c. 44–A. In April 1972 she was notified of a $7\frac{1}{2}\%$ rent increase on her apartment, effective May 1, 1972. She refused to execute an amendment to her lease providing for the higher rent, and she was served with a notice to vacate her apartment. This was· followed by her present action in the United States District Court for the Southern District of New York on behalf of herself and all others similarly situated, in which she is seeking to enjoin collection of the rent increase as a violation of the Economic Stabilization Act of 1970 as amended [1] and the regulations promulgated pursuant thereto.[2] Judge Frankel denied appellant's motion for a preliminary injunction and dismissed her complaint. This appeal was taken from that judgment pursuant to § 211(e)(2) of the Economic Stabilization Act. For the reasons stated herein, we affirm the decision of the court below.

 The fundamental question presented by this case is whether the City of New York "controls" the rents

---

1. Public Law 92–210; 85 Stat. 743 (1971).

2. 6 C.F.R. §§ 301.101–301.651 (1972).

in Pomonok Houses for the purposes of Price Commission Regulation 301.106 (b)(2)[3] which establishes an exemption from the Price Commission's rent controls for residences which satisfy three criteria: (1) the federal, a state, or a local government must have provided financial assistance for the construction or purchase of the housing; (2) the assisting government must not own the housing; and (3) the monthly rent must be "established or controlled" by the assisting government. Appellant concedes that the first two criteria are satisfied here and therefore only the question of control is before this court.[4]

It may be noted that neither the Congress nor the Price Commission has provided any express definition or guideline for the interpretation of the word "control" as used in this regulation. In the context of another regulatory statute, the Communications Act of 1934, the Supreme Court said:

> Congress did not imply artificial tests of control. This is an issue of fact to be determined by the special circumstances of each case.

Rochester Telephone Corp. v. United States, 307 U.S. 125, 145, 59 S.Ct. 754, 764, 83 L.Ed. 1147 (1939). See also Gilbertville Trucking Co., Inc. v. United States, 371 U.S. 115, 83 S.Ct. 217, 9 L.Ed.2d 177 (1962); Chicago, Milwaukee, St. Paul & Pacific Railroad Co. v. United States, 366 U.S. 745, 81 S.Ct. 1630, 6 L.Ed.2d 772 (1961). Therefore, absent a prescribed test for determining whether the City of New York "controls" the rents in Pomonok Houses, we look to the broad purpose of the exemption provided by Regulation 301.106(b)(2) and the overall relationship between the Housing Authority and the City.

■ It is apparent that the purpose of the exemption is to avoid unnecessarily burdening the Price Commission in circumstances where rents are adequately supervised by some other government agency, federal, state or local. The Price Commission deliberately sought to avoid the creation of a two-tiered system of rent control where one tier already existed. As long as some government is protecting the tenants against rent increases violative of the purpose of the economic stabilization program, the Price Commission has chosen to defer to that government's specific form of control.

■ Appellant Rykus contends that the power to control the rents in Pomonok Houses is absolutely vested in the Authority, and not in the City or any of its agencies, by virtue of New York Public Housing Law § 154, which provides, in pertinent part:

> Subject to the terms of any loan or subsidy contract with a government, the power to fix rents on a project shall rest exclusively with the authority . . . .

3. Regulation 301.106(b)(2) provides:
 (b) *Rent controlled housing defined.* For the purposes of this section, the term 'rent controlled housing' means a residence for which the monthly rent is established or controlled either—
 (2) By (in whole or in part) the Federal Government, a State or local government, or an agency or instrumentality thereof, which has provided financial assistance for the construction or purchase of, but which does not own, the residence.
 The term also includes housing provided for students by a school, college, university, or similar institution which owns or controls that housing.
 This section was amended on July 4, 1972 and is now § 301.105(a)(2). Even if the minor revisions had been made prior to the increases in rent here complained of, the holding in this case would not have been affected.

4. In his oral argument before this Court, counsel for appellants interjected the offhand suggestion that New York City has not "provided financial assistance for the construction" of Pomonok Houses. This point was not seriously pressed, but even if it had been, we would have no difficulty in holding that the City's guarantee of the bonds which financed the construction of Pomonok Houses constituted financial assistance for the purposes of this regulation.

The appellee, Housing Authority, on the other hand, contends that three factors modify § 154 in such a way that the power over rents, in the circumstances of the case, is removed from the Authority and rests in the hands of the City. The first of these is the power of the Mayor to appoint and remove the Chairman of the Authority at the Mayor's pleasure, and to appoint the other two members for five-year terms, though they are removable only for cause. While under these circumstances the Mayor may have a certain amount of moral and political suasion, it is not as conclusive as the Housing Authority asserts, and does not constitute a clear repository of the power to fix rents.

■ The second factor claimed by the Authority is that it is the agent of the City to carry out the clearing, replanning and reconstruction of areas where substandard housing exists. Administrative Code, City of New York, § E46-3.0. But this is little more than a broad declaration of policy and is not enough to justify the conclusion that the provisions of § 154 are limited by a superior power in the City to fix rents.

■ The third factor, however, does provide a source of power in the City sufficient to support the holding of the trial court that under the circumstances the City had "control" over the rents in Pomonok Houses for the purpose of Price Commission Regulation 301.-106(b)(2). This power stems from the provisions of the contract between the City and the Authority by which the City guaranteed the payment of the principal and interest on the bonds issued to finance the construction of the houses.

The New York State Public Housing Law § 154, on which the appellant Rykus relies in her argument that the Authority has the exclusive power to fix rents, expressly provides that the Authority's power is "subject to the terms of any loan or subsidy contract with a government . . . ."

Under the contract in this case the Authority was required "to maintain the Project as low rent housing for families of low income," and at the same time it was required by its terms "to pay the principal of and interest upon the bonds that financed the project" and the costs of its maintenance. §§ 14 and 17.[5] Also § 10 of the guaranty contract imposes upon the Authority the obligation to pay the principal and interest of the bonds that financed the project as they come due.[6] It is clear that § 14(1) of the guaranty contract, when read in conjunction with § 10, imposes an absolute obligation on the Authority to keep rents at a sufficiently high level so that, with moneys derived from other sources, the Authority will be able to meet its

5. Section 14. *Low Rent Character of Project.*
 (1) The Authority agrees to maintain the Project as low rent housing for families of low income. Such agreement by the Authority shall not, however, be construed to prevent the Authority from establishing, fixing and collecting rentals for dwellings in the Project at such rates that the rentals charged for such dwellings will at all times be sufficient at least to produce revenues which, together with all other moneys derived from or in connection with the Project from whatever source, will be sufficient:
 (a) to pay as they become due, the principal of and interest on the Bonds;
 (b) to meet the expenses of operation, maintenance, repair and administration of the Project . . . ;
 (c) to create and maintain such other reserves as may be required . . . or deemed advisable by the Authority;
 (d) to produce such additional moneys as the Authority shall deem proper.
 Section 17. *Enforcement of this Guaranty Contract.*
 (1) * * * * *
 (2) The obligations of the Authority under this Guaranty Contract are enforceable by the City by any appropriate action or proceeding . . . .

6. Section 10 of the Guaranty Contract provides:
 Section 10. Authority to Comply With Covenants With Bondholders. The Authority agrees that upon delivery of the Bonds it will carry out and perform all the covenants made by it in the Bonds and the Resolution . . . .

obligations on the bonds and pay the operating expenses of the project.

As Judge Frankel said in his opinion, ". . . the authoritative materials show that defendant Housing Authority is hedged about by City controls exerting pressure upon rents in two directions— so that costs to eligible tenants will be as low as possible, but also so that the Authority's rental income will be sufficient to meet its and the City's broad obligations."

It is undisputed that the Authority had not charged sufficient rent to meet the obligations under the contract and is currently suffering a deficit of millions of dollars in its housing programs. Therefore it is under an enforceable, legal obligation to the City to raise the rents in city-aided housing projects. As there is no allegation or evidence that the revenues from this 7½% rent increase will exceed those mandated by §§ 14(1)(a) and (b), we need not consider appellant's contention that § 14(1)(d) gives the Authority unlimited power to raise rents even further. At least to the extent that the rents are raised no higher than is necessary to satisfy the Authority's absolute contractual obligations under §§ 14(1)(a) and (b), the increase is under the control of the City for the purposes of Regulations 301.106(b)(2) and therefore exempt from Price Commission control. Certainly there is neither rule nor policy of the Price Commission which seeks to require the Authority or the City in such circumstances to operate the project at a loss.

The Authority operates 188 public housing projects of which 27 are city-aided, and the rest are either federal or state aided. The 7½% rent increase was imposed upon all of the projects— federal and state financed as well as those like Pomonok, which were City financed. The federal and state rent control bodies approved of the same 7½% rent increases. This tends to make

somewhat academic the claim of the appellant that she is suffering because her rent increase was not approved by a governmental body of the City comparable to those which controlled rents in federal and state financed projects. All of these 188 projects were deficit operations and there is no claim that the rent increase was improper as imposed upon the federal and state financed projects; nor were there distinguishing characteristics of the 27 City financed developments which made the 7½% increase unfair and unreasonable as to them though fully justified in the cases of those financed by the federal or state governments. We agree with the trial court that it would be absurd to read the federal price regulations to exempt the 160 or so projects aided by federal and state funds while leaving the 27 city-aided projects subject to the rules governing uncontrolled private landlords, and that such a construction of the regulations should be avoided, if in fairness, it is possible to do so.

It is true that, unlike the Authority's contracts with the federal and state governments covering projects for which they provide financial assistance, the guaranty contracts for city-aided projects do not make specific provision for prior approval of proposed rent schedules by any designated official or agency.[7] Rather, it appears that the City's only recourse in the event of its dissatisfaction with an Authority decision concerning rents, beyond the Mayor's power to remove the Chairman of the Authority, is to bring a legal action against the Authority to enforce the guaranty contract. While we recognize that the Price Commission may have had in mind rent supervision along the lines provided for federal and state aided projects when it promulgated Regulation 301.106(b)(2), we conclude that the power of New York City to enforce this guaranty contract by a legal action is

7. For a discussion of the guaranty contracts in state-aided projects and such housing's exempt status under Regulation 301.106(b)(2), see the Memorandum

Opinion of Chief Judge Mishler in Walker v. New York City Housing Authority, 349 F.Supp. 1344 (E.D.N.Y.1972).

sufficient to place "control" over rents in the hands of the City to the extent that the guaranty contract specifically regulates the rents that may be charged. It is conceivable that even if prior approval by a city rent board or official were required, the Authority might act without such approval or defy the ruling by the board or official. In that event the City's only recourse would be an action in the courts. This is the only method of enforcement available to any statutorily designated rent control agency. For example, even if we held that these apartments were under the control of the Price Commission, the mandate of that body would be enforceable only by means of action in the courts. Therefore, for the purpose of deciding in a given set of circumstances whether or not "control" within the meaning of Regulation 301.-106, exists, it does not make any real difference whether the underlying basis for the action derives from a contract or a statute.

The City has a substantial and important role in the determination of the challenged increase, including the fulfillment of its duty to maintain the projects as low-income housing. The tenants of Pomonok Houses are as protected by this method of control as are the tenants of federal and state aided projects by the alternative system. The nature and extent of the control exercised by the City brings the case within those which the Price Commission intended to leave to the responsibility of the agencies or governmental bodies charged with fixing rents.

■ The appellant's remaining points require only brief comment. First, ap-

pellant has suggested that exempting Pomonok Houses from the federal rent controls would violate "the Equal Protection Acts [sic] of the United States Constitution" because other tenants are protected by those controls. The Supreme Court has held:

A statutory classification in the area of social welfare is consistent with . . . Equal Protection . . . if it is 'rationally based and free from invidious discrimination.' Dandridge v. Williams, 397 U.S. 471, 487, 90 S. Ct. 1153, 25 L.Ed.2d 491 [1970].

Richardson v. Belcher, 404 U.S. 78, 81, 92 S.Ct. 254, 257, 30 L.Ed.2d 231 (1971). It is perfectly rational to exempt from Price Commission control, housing whose rents are controlled by another government or agency thereof.[8]

■ Finally, appellant claims that the district court erred in its failure to hold a full evidentiary hearing at which the question of the degree of consultation between the Authority and the City could have been more fully explored, but the appellant waived her right to a hearing in the trial court [9]; and, she does not deny that consultations took place before the rent increase was put into effect. The thrust of her argument on this point is that such consultations are not mandated by statute or by the guaranty contract, and therefore should be given no legal effect. But this is an issue of law, not fact; consequently there was no reason to hold an evidentiary hearing.

The judgment of the district court denying an injunction and dismissing appellant's complaint is affirmed.

8. Appellant also appears to contend that it is a denial of Equal Protection to exempt these rents from the controls while incomes are "frozen." This argument is inherently frivolous because (1) incomes are not frozen under the economic stabilization program, and (2) these rents have not been exempted from control—they have simply been relieved of their potential subjection to double control.

9. Rykus v. New York City Housing Authority, 72 Civ. 2108 (S.D.N.Y.1972), Memorandum Opinion at 9.