296 F.Supp. 853 (1968)
UNITED STATES of America, Plaintiff,
Charles E. Brundage, Bradford F. Story, Samuel C. Williams, Jr., Warren Clark, constituting the Northern Pacific Stockholders' Protective Committee, Board of Railroad Commissioners of the State of Montana, State of Washington, City of Auburn, Public Service Commission of the State of Minnesota, Livingston Anti-Merger Committee, Intervenor-Plaintiffs,
v.
UNITED STATES of America and Interstate Commerce Commission, Defendants,
Great Northern Railway Company, Northern Pacific Railway Company, Chicago, Burlington & Quincy Railroad Company, Spokane, Portland and Seattle Railway Company, Pacific Coast Railroad Company, Great Northern Pacific & Burlington Lines, Inc., Chicago, Milwaukee, St. Paul & Pacific Railroad Company, 230 Pacific Northwest Shippers, Public Utility Commissioners of Oregon, Intervenor-Defendants.
Civ. A. No. 1132-68.
United States District Court District of Columbia.
November 20, 1968.
Probable Jurisdiction Noted February 24, 1969.
*854 Donald F. Turner, Special Asst. Atty. Gen., for plaintiffs. With him on briefs were Asst. Atty. Gen., Edwin M. Zimmerman, David G. Bress, U. S. Atty., Robert *855 A. Hammond, III, Howard E. Shapiro, B. Barry Grossman, Washington, D. C., and Arthur I. Cantor, Silver Spring, Md.
Robert W. Ginnane, Gen. Counsel, I. C. C., for defendants. With him on briefs were Fritz R. Kahn, Jerome Nelson, Betty Jo Christian, Nahum Litt, and Raymond M. Zimmet, Washington, D. C.
Louis B. Dailey, New York City, for Charles E. Brundage, Bradford F. Story, Samuel C. Williams, Jr., Warren Clark, constituting The Northern Pacific Stockholders' Protective Committee, intervenor-plaintiff. With him on briefs was Harry Tyson Carter, Washington, D. C.
John C. Sheehy, Billings, Mont., for Bd. of Railroad Commissioners of the State of Montana, intervenor-plaintiff. With him on briefs were William T. O'Leary, Helena, Mont., and Marvin J. Sonosky, Washington, D. C.
Patrick McEligot, Asst. Atty. Gen., for State of Washington, intervenor-plaintiff. With him on briefs were John J. O'Connell, Atty. Gen., and Frank P. Hayes, Asst. Atty. Gen.
Joel E. Hoffman, Washington, D. C., for City of Auburn, intervenor-plaintiff. With him on briefs were Robert L. Wald, Washington, D. C., and Alva C. Long, Auburn, Wash.
Valentine B. Deale, Washington, D. C., for Livingston Anti-Merger Committee, intervenor-plaintiff.
Robert E. Sher, Washington, D. C., for Public Service Commission of the State of Minnesota, intervenor-plaintiff. With him on complaint was Richard Musenbrock, Minneapolis, Minn., Special Counsel to the Public Service Commission of State of Minnesota.
D. Robert Thomas, Chicago, Ill., for Great Northern Railway Co., Northern Pacific Railway Co., Chicago, Burlington & Quincy Railroad Co., Spokane, Portland & Seattle Railway Co., Pacific Coast Railroad Co., and Great Northern Pacific & Burlington Lines, Inc., intervenor-defendants. With him on briefs were Ray Garrett, Lee B. McTurnan, Eldon Martin, R. T. Cubbage, Chicago, Ill., Anthony Kane, L. E. Torinus, Jr., Earl F. Requa, Frank S. Farrell, St. Paul, Minn., and Richard J. Flynn, Washington, D. C.
Raymond K. Merrill, Chicago, Ill., for Chicago, Milwaukee, St. Paul & Pacific Railroad Co., intervenor-defendant. With him on briefs were Edwin O. Schiewe, Thomas H. Ploss, Chicago, Ill., and Patrick H. Corcoran, Washington, D. C.
Fred H. Tolan, Seattle, Wash., for 230 Pacific Northwest Shippers, intervenor-defendant. With him on briefs was Alan F. Wohlstetter, Washington, D. C.
Henri F. Rush, Jr., Special Asst. Atty. Gen., of Oregon, for Public Utility Commissioner of Oregon, intervenor-defendant. On briefs were Robert Y. Thornton, Atty. Gen., of Oregon, Richard W. Sabin, Salem, Or., Dale T. Crabtree, Klamath Falls, Ore., and William I. Harkaway, Washington, D. C.
Before BAZELON,[*] Chief Circuit Judge, FAHY,[*] Senior Circuit Judge, and CURRAN, Chief District Judge.
Probable Jurisdiction Noted February 24, 1969. See 89 S.Ct. 874.

OPINION
FAHY, Senior Circuit Judge:
This suit arose on complaint of the United States, acting through the Department of Justice, to enjoin and set aside orders of the Interstate Commerce Commission of November 30, 1967, April 11, 1968, and June 17, 1968.[1] The first of these orders approved, with conditions, applications of the railroad companies hereinafter named to merge and to complete related transactions. The approval followed reconsideration of the "Report of the Commission" (First Report) of March 31, 1966, which had denied *856 the merger applications as not consistent with the public interest.[2] The April 11, 1968 order denied petitions for reconsideration of the order of November 30, 1967, except in relatively minor respects which modified the Commission's retention of jurisdiction and certain of the Commission's protective conditions. The order of April 11, 1968 is not now independently contested.
The Interstate Commerce Commission answered the complaint, opposing the relief sought by the Department of Justice. Other parties, as set forth in the margin,[3] have intervened, some as plaintiffs, some as defendants, the latter including the applicant railroad companies.
After preliminary proceedings resulting in a stay of the orders pending either decision on the merits or further order of the court the case was submitted to this three-judge District Court designated in accordance with 28 U.S.C. §§ 2325, 2284 for decision on the record before the Commission, the pleadings, briefs, memoranda and oral arguments.
We sustain the Commission's approval of the merger and related transactions. The history and nature of the case lead to an opinion which explains our reasons at some length. We review the elaborate decision of the Commission. We conclude that in giving its approval the Commission was guided by the applicable legal principles and made findings, supported by substantial evidence, requisite to the validity of its action. We recognize that some of those findings are necessarily conclusional. These we hold to be reasonable. A number of conditions are attached by the Commission to its approval. These in our view are just and reasonable, as well as reassuring.
Our opinion also considers the objections raised by the Department of Justice, the State of Washington, the City of Auburn, the Board of Railroad Commissioners of the State of Montana, and the Livingston Anti-merger Committee. We devote special attention to whether the competitive situation to result from the unification, conditioned as it will be, is inconsistent with the public interest, or, as we believe, is consistent therewith in light of the national transportation policy formulated by Congress. We conclude, also, that the ratio of stock exchange approved by the Commission is just and reasonable, that the employee problem is satisfactorily solved and, as will appear, that other contentions against the merger do not override the benefits, including savings and better service, which are projected in the reasoned judgment of the agency charged with primary governmental responsibility. We note with approval the retention by the Commission of jurisdiction to enable it to make such readjustments as may appear to be desirable, including those which may arise from pending proceedings affecting other railroads in the vast territory involved.
The orders in question[4] eventuated from applications filed February 17, *857 1961,[5] under 49 U.S.C. § 5[6] by Great Northern Railway Company (Great Northern), Northern Pacific Railway Company (Northern Pacific), these companies being sometimes referred to as Northern Lines, the Pacific Coast R. R. Co. (Pacific Coast or PC), the Chicago, Burlington & Quincy Railroad Company (Burlington), and the Spokane, Portland and Seattle Railway Company (SP&S), these latter two companies being subsidiaries of the Northern Lines, all common carriers by railroad subject to Part 1 of the Interstate Commerce Act, and Great Northern Pacific & Burlington Lines, Inc., (New Company or NuCo), which is not a carrier. The carriers applied to merge into New Company, and for lease by the latter of SP&S, with control of subsidiaries and the completion of other transactions better to effectuate the merger and lease.[7]
*858 Extensive proceedings ensued before the Commission, including public hearings and an examiner's report served August, 1964, which recommended approval of the applications, but with which the Commission did not agree. On applicants' petition of July 27, 1966,[8] the Commission reopened the proceedings on January 4, 1967, for reconsideration and oral argument on all issues and for limited further hearing to determine, on the basis of current information readily available, the amount of estimated savings resulting from the proposed merger in light of (1) agreements entered into between the applicants, on the one hand, and, on the other, the Milwaukee and North Western and (2) the effect of relevant financial, operational and other changes related to savings, which had occurred subsequent to close of the hearings. Those matters were referred to an examiner for hearing.
The reconsideration resulted in the decision of November 30, 1967, accompanied by the exhaustive "Report of the Commission on Reconsideration and Further Hearing" (Second Report), with appropriate order approving the applications and related transactions.
New Company in consequence would achieve unified control and operation of a network of railroads of almost 27,000 miles of tracks extending from the Great Lakes and Mississippi River through the Northern Tier States to the Pacific Northwest and California, and reaching through affiliates[9] to the Gulf of Mexico. Great Northern operates some 8200 miles of road located in ten states and two Canadian provinces. Northern Pacific operates some 6800 miles of road with lines in seven states and one Canadian province. These roads extend from the Twin Cities across the Northern Tier States to Spokane, Tacoma and Portland, with branch lines serving the lumber and agricultural producing territories along the route. Burlington's 8648 miles of road are located in eleven states extending from Chicago northwesterly to the Twin Cities, and westerly and southwesterly to Missouri, Kansas, Colorado and Montana, with subsidiaries reaching the Gulf of Mexico at Houston and Galveston.[10] Since the Burlington routes are largely complementary to those of Northern Lines there is no substantial competition between Burlington and its parents. The SP&S in Washington and Oregon has the most direct route from Spokane to Portland and is of strategic importance to Northern Lines since Spokane is on the main transcontinental routes and Portland is an important terminal for both. Northern Pacific has extensive land holdings, from which it derives important income; and New Company would obtain title in fee to more than two million acres and to mineral rights in an additional six million acres.
The main lines of Great Northern and Northern Pacific are both parallel and complementary. The greater part of the latter's mileage is in the western part of the system while the greater part of the former's is in its eastern portion. West of Minnesota, Great Northern serves primarily those communities lying to the north while Northern Pacific serves the southern parts of these states. Only *859 Great Northern reaches California. The area transversed by Northern Lines is lightly populated except at its eastern and western extremities. But the area is extensive, some 1700 miles in length and 900 miles in breadth. It is rich in animal, mineral and forest resources, with, however, a limited market for its products. For this reason producers are heavily dependent upon transportation. Rail transportation to populous centers at cost low enough to permit participation in those markets is important.
As the Commission also points out there is an imbalance of traffic. Historically the West has been a market for the finished products of the Midwest and the East and a supplier to those areas of basic raw materials. Its lower-rated traffic in its long haul east is not as vulnerable to incursions by intermodal competitors of Northern Lines as is the higher-rated manufactured traffic moving into the area served by Northern Lines. The latter, both from the East and from the West Coast is vulnerable to motor carrier competitors and others. It is this traffic which the rail carriers must retain to balance their operations.
A combination of factors, the Commission narrates, had long convinced the management of Northern Lines that, together with Burlington, SP&S and Pacific Coast, they should be unified under New Company's control. They serve the same eastern terminals and western ports as competitors and the traffic they carry is similar. It is different only in areas where their lines are widely separated, with no substantial competition, however, between either of the Northern Lines and Burlington, whose traffic differs and whose service area is not only more heavily populated than that of Northern Lines but also furnishes an important market for producers in the area served by Northern Lines.
Management of Northern Lines considered that these railroads, with Burlington, SP&S and Pacific Coast, which they control, if unified under New Company with an enlarged and more efficiently coordinated pool of rolling equipment, elimination of duplicative functions, facilities and personnel through attrition, and with routing, transit and other services more finely tuned to the needs of the shipping public, would be a more proficient railroad than the applicants separately. Greater ability to adjust to seasonal and economic fluctuations in traffic, thus maintaining a better over-all balance, would result. The whole would be better than the sum of its component parts and better able to cope with the increased intermodal competition of motor and water carriers which has intensified with improved highways and waterways.
In early 1956 Northern Lines through a joint management committee began preparations for merger proceedings. The independent transportation engineering firm of Wyer, Dick & Company, referred to as Wyer, was employed to analyze and report on the operating advantages and financial savings which could be realized. This was followed by agreements under which New Company was formed and the terms and conditions of the proposed unification were formalized.
The Second Report of the Commission embodying the basic decision of November 30, 1967, now challenged, in addition to the above background material, includes a reexamination of the First Report, outlines the hearing on reconsideration, explains the positions of various parties, and devotes special attention to the objections of the Department of Justice. The agreements executed by applicants with the Milwaukee and the North Western railroads are explained. These evidence applicants' acceptance of conditions favorable to Milwaukee and North Western, deemed essential to the public interest finding of the Commission accompanying its approval of the applications. As a consequence of these conditions those roads withdrew opposition to the merger. Agreements of applicants with representatives of the employees are considered. While the Commission notes the opposition of the Railway Labor Executive Association *860 (RLEA), we point out that subsequent agreements affecting employees have led to withdrawal of employee opposition to the merger. The Commission required, as a condition to approval, that attrition conditions such as were contained in agreements which had been reached would be applied to all affected[11] employees, thus eliminating one of the reasons for the First Report's denial of the applications. The Second Report states:
[A]s this report will show, we are convinced on deliberate and searching reconsideration that the proposed unification, subject to appropriate conditions which we shall specify to protect competing railroads, employees and the general public, will be consistent with the public interest and should be approved. 331 I.C.C. 244-245.
The Commission followed with a discussion of the relevant statutory criteria, analyzed the relevant financial data, included a finding that merger would entail no increase in the aggregate fixed charges, set forth the major proposals for unification of operations and of properties, and explained the stock exchange ratio between the holders of Northern Pacific and Great Northern stock. The benefits of merger to applicants, to shippers and to the general public, were enumerated.
The Commission analyzed at length the competitive situation, which we shall consider more fully, and discussed and made findings with respect to the protection of other railroads. It emphasized the change in the situation since the prior report, reaffirmed its finding that the survival of no railroad operating in the territory was imperiled, and further found,
As modified by the conditions which we impose hereinafter, most of which were the subject of agreements between applicants and the railroad interveners, the proposed unification presents an entirely new perspective for intramodal competition in the efficient and economical movement of transcontinental, western and Pacific Coast traffic. That perspective portends for a stronger capability in those railroads individually and collectively to prosper and to effect numerous economies and efficiencies from which the public will benefit. 331 I.C.C. 281.
The situation with respect to Western Pacific and the objections of Union Pacific, not here pursued, to Milwaukee's entry to Portland, were discussed. Reference was also made to applicants' stipulations with the Milwaukee, the North Western and other roads. The Commission concluded this branch of its Report by stating that the over-all effect of the conditions imposed, which it found to be just and reasonable, would make for a stronger degree of intramodal rail competition in the affected territory, promote the effective development of improved transportation services to the shipping and receiving public, and comport generally with the purposes and objectives of the national transportation policy as declared in the Act, and "are within the scope of section 5(2) (a) and will be consistent with the public interest." The conditions are set forth in Appendix L to the Second Report, as modified by the reports of April 11, 1968, and June 17, 1968.
Under the heading "Other Issues" the economic effect of the unification on various communities, including the loss of job opportunities or tax revenues due to elimination or rerouting of traffic, is *861 considered. The Second Report concludes that the record does not show that the transportation requirements or well-being of the areas or communities would best be served by denial of the applications, but, to the contrary, that the mergers suitably conditioned augur an era of increased railroad strength, in both intramodal and intermodal competitive aspects in the long run.
The stress placed in the earlier stages of the proceedings on the potential effect of merger on motor carrier rights and operations was considered. The objection raised by Rio Grande to the inclusion of Burlington in the proposed merger was also considered. The Commission concluded that the inclusion of Burlington was necessary not only if the merger is to achieve the results desired but also in order that the many shippers and receivers served by Burlington would participate in the public benefits flowing from the merger. As to the further point raised by Rio Grande concerning the over-all effects and cross-effects of the merger and of the proposals pending in Finance Docket No. 22688, et al.,[12] involving North Western and other roads, and the proposals in Finance Docket No. 24182, et al.,[13] involving the Milwaukee and the North Western and other roads, the Commission points out that it is faced with various procedural alternatives. In view of the over-all situation the Commission decided to reserve jurisdiction for a period of five years following consummation of the transactions authorized so as to be able to impose such just and reasonable conditions upon petition of any party in interest or upon its own motion, after hearing, that may be necessitated by any cumulative or cross-over problems stemming from approval of this merger and any other transaction authorized under Section 5 with respect to the territory involved, citing B. & O. R. Co. v. United States, 386 U.S. 372, 387, 87 S.Ct. 1100, 18 L.Ed.2d 159. See Condition 33, Appendix L, as modified by the subsequent report of April 11, 1968.
The Commission also retained jurisdiction for a like period for the purpose among others of considering petitions under Section 5(2) (d) of the Act by any railroad in the territory involved requesting inclusion in the merger. The Commission held that consummation of the transactions authorized would constitute irrevocable assent by applicants to the Commission's reservation of power to impose, after hearing, such just and reasonable conditions as may be necessary and appropriate.
In its "Summary" the Commission pointed out that the result of the prior First Report was a product of a weighing of three factors: a lessening of competition as between Great Northern and Northern Pacific; an adverse effect upon employees; and the benefits to be derived by applicants and the shipping public; but that on reconsideration of these factors based upon the entire augmented record:
[W]e now reach a different conclusion. The concern expressed in the prior report as to employee hardship has been relieved by the attrition conditions imposed and agreed to. The speculation that imposition of conditions for the benefit of Milwaukee and NW might actually preclude consummation has been set to rest by the agreements accepting those conditions. The preservation of competition between the Northern Lines in the four northern tier States, which was a dominant factor in the prior decision, we now view in a different perspective and do not see it as an invincible impediment to this merger. Like the many shippers who support the applicants and who do business in the said States, and like the numerous States, State and Federal agencies, communities and shipper groups which have dropped their opposition and now favor the merger, we see this transaction as a means for achieving, through appropriate conditions, overriding benefits to the public through improved *862 transportation. Broadening the focus of our appraisal to the area relevant to transcontinental traffic and other interterritory considerations, and reweighing the facts pertaining to the ever-increasing intermodal competition, have made it apparent that this merger can lead to the creation of meaningful rail competition through strengthening the Milwaukee and the NW, as well as making the combined applicants a more proficient transport agency. Viewing the considerations anew, we conclude that the proposals, with requisite conditions, are entirely consistent with the public interest. 331 I.C.C. 289.
The Commission thereupon added its ultimate findings that, if approved with the conditions it requires, the transactions meet the requirements of Sections 5(2) and 20a and b of the Act, conform generally with the purposes and objectives of the national transportation policy, are consistent with the public interest, will enable New Company to use service by motor carrier to public advantage in its rail operations, and will not unduly restrain competition. Moreover, the Commission found that the financial arrangements it outlined are compatible with the public interest, are necessary, appropriate and consistent with performance of service to the public as common carriers, will not impair the ability to perform that service, and should be authorized.
Finally, the Commission found that the present and future public convenience and necessity require construction and operation by New Company of the connecting lines enumerated in the Second Report, (Appendix J), and permit abandonment by applicants of designated railroad lines, (Appendix K).
It is seen from the foregoing that the findings essential to approval of the applications were made. Some of these are not ordinary factual findings. They are conclusions drawn from the relevant factual situations disclosed by the evidence.
We now test further the action of the Commission by considering it more fully in light of the objections to approval. We bear in mind that, as the reviewing court, "We do not inquire whether the merger satisfies our own conception of the public interest. * * The judicial task is to determine whether the Commission has proceeded in accordance with law and whether its findings and conclusions accord with the statutory standards and are supported by substantial evidence." Penn-Central Merger & N. W. Inclusion Cases, 389 U.S. 486, 498-499, 88 S.Ct. 602, 608, 19 L.Ed.2d 723.

The Problem of CompetitionIn General.
The United States, through the Department of Justice, centers its opposition upon the Commission's appraisal of the resulting competitive situation. The Department sees an invasion of the public policy represented by the antitrust laws, not countered by benefits which justify the merger in the public interest. Since the transactions came within Section 5(a), the over-all guide is the national transportation policy to further the public interest in efficient transportation. 49 U.S.C. § 5(2) (b), note 6, supra.
The Department contends that the Commission erred in construing the national policy as one to further consolidation of railroads into a limited number of systems with a presumption in favor of mergers. While the Commission interpreted the national policy as encouraging mergers, we do not think it was guided by a presumption. It concluded that "the policy of the [Transportation Act of 1940] is clearly to facilitate and thereby foster and encourage consolidations which can be shown to be consistent with the public interest." 331 I.C.C. 269. Thus, consolidation must be shown and not presumed to be consistent with the public interest.
The importance of competition as an indispensable factor in the public interest equation is recognized in the Second Report; but it is not the only *863 factor to be weighed under the policy of Congress. Penn-Central Merger Cases, supra at 500, 88 S.Ct. 602; Seaboard Air Line R. Co. v. United States, 382 U.S. 154, 86 S.Ct. 277, 15 L.Ed.2d 223.
Competition is merely one consideration here. See Seaboard Air Line R. Co. v. United States, 382 U.S. 154, 86 S.Ct. 277, 15 L.Ed.2d 223 (1965). This departure from the general and familiar standard of industrial regulation emphasizes the need for insistence that, before a rail merger is approved, there must be convincing evidence that it will serve the national interest and that terms are prescribed so that the congressional objective of a rail system serving the public more effectively and efficiently will be carried out. Obviously, not every merger or consolidation that may be agreed upon by private interests can pass the statutory tests.
Penn-Central Merger and N. & W. Inclusion Cases, 389 U.S. at 500, 88 S.Ct. at 609. The Commission in its Second Report evidenced an understanding of the governing guidelines.
The tremendous area involved, with its numerous centers of population and diversified sources of traffic, leads to equally tremendous detail related to the effect of the merger on competition. In its First Report of March 31, 1966, disapproving the merger, see, e. g., 328 I.C. C. 511 et seq., and in its Second Report of November 30, 1967, approving the merger, see, e. g., 331 I.C.C. 269 et seq., the Commission analyzed the competitive problem in detail. In the First Report it concluded that after merger the applicants would overshadow their rail competitors and that they had failed to show that merger would result in transportation service to the public superior to that which could be provided without merger, "or that the benefits reasonably attributable to the proposed merger outweigh the adverse effects of the merger on carrier employees and the benefits that shippers derive from the competition to be eliminated." 328 I.C.C. 528.
Following this Report the employee problem disappeared, and, moreover, a different conclusion was reached as to the benefits to shippers. But at this point we are concerned with competition. The Commission classified stations into four classes: I. Stations commonly served by two of the applicant carriers and no other rail carrier; II. Stations commonly served by two of the applicant carriers and at least one nonapplicant carrier; III. Stations served by one applicant only; IV. Stations served by one applicant and one or more other rail lines. The Commission noted that some of the Class II points, though served by one or more of the applicants, did not have actual competition between any of the applicants because the applicant lines were end-to-end or complementary at these points. As to the principal Class II points in the Northern Tier, Head-of-Lakes, Portland, Seattle, Spokane, and the Twin Cities, the Commission observed that each of these points would be served after the merger by at least three railroads (in the case of the Twin Cities, by nine) and by numerous truck lines, bus lines, and airlines. The Commission concluded:
In our view the competitive impact upon the Class II stations is not so significant as to warrant denial of the applications. First, apportionment of traffic between (Great Northern), (Northern Pacific) and other roads serving these points is not wholly the result of interplay of competitive forces, but often results from other factors entirely. Second, shippers at these Class II locations, in addition to the Northern Lines and one other rail carrier, are generally served by other modes of transportation vigorously competing for traffic. Third, by virtue of the conditions imposed in this case, the Milwaukeewhich is the other railroad serving many of the Class II pointswill be substantially strengthened as a meaningful transcontinental competitor. 331 I.C.C. 273. *864 Accordingly, without reassessing the market shares of the merging lines in the relevant Northern Tier, the Commission concluded that the locations at which competition would be most significantly reduced would still have available substantial rail and nonrail carriers so as to preserve sufficient competition to warrant approval of the merger.
Moreover, in its Second Report the Commission concluded that the number of stations at which competition would be entirely eliminated was small, "and these stations do not produce any great volume of applicants' business." 331 I.C. C. 272. Some of these stations are located on the main line of one applicant and on a branch line of another, "with the result that loss of competition is more theoretical than real." 331 I.C.C. 272. Concern was evidenced as to Class II stations. However, the finding that the allocation of traffic is not wholly the result of competitive forces is another way of saying that the percentage figures pertinent to Class II stations tend to over-emphasize the importance of intramodal competition at these points. This conclusion finds ample support in the record. The factors considered by the Commission are broadly indicative of the weakness of the Department of Justice's emphasis on raw statistics. For example, between the Twin Cities and points served by only one of the applicants shipments are on the one line that serves the noncompetitive point although nine railroads serve the Twin Cities. Noncompetitive Class III stations account for 37 percent of applicants' revenues, Ex. 16, p. 3. Since the elimination of competition between the applicants is now the issue, it should be noted that over 90 percent of applicants' stations are Class III or IV. Accordingly, much of the revenue attributed to Class II stations is not subject to competition between the applicants. Percentage figures are misleading in another way. The car and tonnage figures, but not the revenue figures, are duplicative as to shipments originating and terminating on applicants' lines. Tr. 3197-98. Further, where Class II stations are located on the branch line of one applicant and on the main line of another, the time factor may eliminate the branch line as a realistic competitor. Thus, the branch line of one railroad is more complementary than competitive with the main line of the other. Tr. 3187-88. Similarly, in many instances, the physical location of the shipper's facility gives one railroad a decided advantage although the other railroad is only a short distance away. Tr. 3127-28, 3190, 6033, 7390-91, 14685. The practice of some large shippers of distributing their business among the various railroads may well result in the reduction of the merged lines' total share of these shippers' patronage. Ex. 228, p. 16; Ex. 230; Tr. 5751, 5757, 9804.
The Commission did not deem it was required to determine the areas of effective competition through an analysis of the relevant geographic and product markets, as those terms are used in antitrust cases, cf. Brown Shoe Co. v. United States, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510. We agree. See Seaboard Air Line R. Co. v. United States, 382 U.S. 154, 86 S.Ct. 277, 15 L.Ed.2d 223. The Interstate Commerce Act and other legislation dealing specifically with transportation was the frame of reference within which the Commission operated, with accommodation, however, to the antitrust policies without being bound to the relevant-market standards of the anti-trust laws. See McLean Trucking Co. v. United States, 321 U.S. 67, 79-80, 64 S.Ct. 370, 88 L.Ed. 544.

CompetitionThe Milwaukee.
A telling objection to approval of the merger at the time of the First Report was made by Milwaukee, which insisted that unless approval were conditioned in such a manner as to strengthen its competitive position with Northern Lines the merger was not in the public interest. In the interim between the First Report and reconsideration of the applications Northern Lines entered into an agreement with Milwaukee accepting the conditions *865 Milwaukee sought. The Commission's approval is conditioned upon the carrying out of these conditions. Milwaukee accordingly no longer objects to approval; indeed, it now urges it. The conditions referred to are important to the ultimate issue of public interest.[14]
One of the main lines of Milwaukee runs from Chicago through the Twin Cities and across the Northern Tier States to the Pacific Coast. Milwaukee's original expectations for greater competition with applicants, as matters developed, did not materialize. A substantial reason was that its lines were blunted by not reaching Portland, Oregon, or Bieber, California. Neither Great Northern nor Northern Pacific would interchange traffic with Milwaukee except in circumstances which gave Northern Lines the longest possible haul over their own roads. This privilege of Northern Lines not to "shorthaul" themselves means that traffic originating on the Milwaukee east of the Twin Cities aud destined for Portland or California was required to be turned over to one of the merging lines at the Twin Cities. As a consequence, Milwaukee was precluded from being a true transcontinental competitor and was unable to make full use of its extensive trackage ending only a few miles short of Portland. Moreover, Milwaukee was completely precluded from the extensive North-South traffic on the West Coast. Similarly, traffic destined for intermediate points on one of the Northern Lines had to be transferred to that line at the Twin Cities even though there were several junctions among Milwaukee and Northern Lines farther west. After discussing these limitations, the Commission concluded in its First Report:
The limitations on Milwaukee's routes west of Twin Cities and Sioux City, together with the fact that Milwaukee is short hauled at the Twin Cities gateway on a large volume of traffic, has severely limited Milwaukee's traffic potential, and has impaired its competitive position in relation to applicant railroads. Consequently, Milwaukee's participation in substantial movements of transcontinental traffic over its lines west of Twin Cities is limited to that which moves to or from a point served directly by the lines of Milwaukee and to those movements within Mountain-Pacific territory to points beyond its lines, which originate or terminate at local points on its lines not served by applicant railroads. On the other hand, the ability to participate in traffic to and from Oregon and California has been an important factor in the ability of the Northern Lines to improve their relative participation in traffic over their lines west of the Twin Cities. Numerous shippers have indicated that the rate and service limitations *866 on Milwaukee routes have prevented them from making full use of the latter's service potential, to their detriment as well as the Milwaukee's. 328 I.C.C. 493.
In order to alleviate Milwaukee's disabilities and to make it a stronger competitor, the Commission in its Second Report attached conditions designed to remedy its handicaps. Condition 23 now made a part of approval will open to Milwaukee gateways at eleven points in the Northern Tier, thus allowing it to utilize more of its trackage west of the Twin Cities. This condition, again referring to the language of the Commission in its First Report,
[W]ould permit Milwaukee to solicit for its longest practical haul over its lines west of Twin Cities or Sioux City traffic which must now be surrendered or received at those points. Correspondingly, New Company would have the same opportunity. The condition would also permit shippers to select alternate routes, according to their needs, over the lines of the Milwaukee and the New Company. In addition, shippers and receivers using Milwaukee would gain the advantage of diversion and reconsignment, stopoff and transit privileges available to shippers and receivers using the New Company. 328 I.C.C. 499.
Condition 24(a) will allow the Milwaukee to extend its present termination point from Longview Junction another 47 miles into Portland and there to connect with the Union Pacific so as, for the first time, to be able to compete with Northern Lines transcontinental routes as well as to provide competing North-South service on the West Coast. Exam. Rep. 276-84; 328 I.C.C. 494; 331 I.C.C. 280-83, 357, 872-73. Condition 24(b) will allow Milwaukee to connect directly with Canadian roads north of Portland. Exam.Rep. 284-87; 328 I.C.C. 494; 331 I.C.C. 280-81, 357. Condition 24(c) will allow Milwaukee to serve Billings, one of the two largest cities in Montana, which is presently served only by the Northern Lines. Milwaukee already serves the other major Montana city. Exam.Rep. 287; 331 I.C.C. 281, 357. Condition 25(a) will eliminate the dual basis of switching charges that discourages the movement of traffic over the Milwaukee and the location of industry along its lines. Exam.Rep. 289-91; 328 I.C.C. 493; 331 I.C.C. 280, 357. Condition 25(b) will require reestablishment of rate relationships disturbed by the merger, 331 I.C.C. 280, 358.
The Commission concluded that "a properly conditioned merger, with NuCo competing against a strengthened Milwaukee, will serve to enhance rail competition,[15] achieve a more desirable competitive pattern, while at the same time conferring substantial benefits upon the shipping public throughout the territory involved in this case." 331 I.C.C. 275. And see 331 I.C.C. 289.
It was not necessary, as the Department of Justice suggests, that the Commission analyze in more detail the relative competitive strengths of the Milwaukee and the applicants after the merger. The evidence gives substantial support to the conclusion of enhanced competition by Milwaukee, with traffic *867 diversions to it from the merged lines. The Commission's reliance upon this factor in reaching its conclusion that the merger was in the public interest must be accepted as valid, even though the merged lines will have a larger market share than Milwaukee. Milwaukee, by no means a negligible competitor previously, will become for the first time a much strengthened competitor, realistically vying for long haul traffic at every major point served by Northern Lines. The Commission was not required in all the circumstances upon which it did rely to go further by seeking unattainable precision as to the amount of traffic diversion.
One further word on this subject: The Commission was not unmindful of the pending proceeding involving the merger of the Milwaukee with the North Western. Although this merger was not discussed in connection with the strengthening of the Milwaukee by conditions accompanying approval of the Northern Lines merger, the Commission prefaced its "Summary" on reconsideration:
We cannot isolate our actions herein from [the larger context of the western rail merger picture], but intend this decision to be a beginning step in the orderly resolution of what has become a highly involuted situation affecting many railroads throughout the territory. 331 I.C.C. 289.

Competition  The Question of Strengthening the Milwaukee Independently of the Merger.
The Department contends that Milwaukee could have been strengthened without the merger and, therefore, the Commission was not entitled to attribute to the merger any benefits due to those conditions to approval which aid the Milwaukee. It is the position of the Department that under Section 1(4), 49 U.S.C. § 1(4), of the Act the Commission could require the railroads to "establish reasonable through routes" with other carriers. It is said that this, with the duty of the railroads under Section 3(4), 49 U.S.C. § 3(4), to "afford all reasonable, proper, and equal facilities for the interchange of traffic between their * * * lines and connecting lines," and not to "discriminate in their rates, fares, and charges between connecting lines, or unduly prejudice any connecting line in the distribution of traffic that is not specifically routed by the shipper," empowers the Commission to require the opening of gateways, end discrimination in interchanges, and otherwise remedy the practices of the Northern Lines which the Commission found have severely limited Milwaukee's competitive potential in the past. The Department also refers to Section 15(3), 49 U.S.C. § 15(3), which provides:
The Commission may, and it shall whenever deemed by it to be necessary or desirable in the public interest, after full hearing upon complaint or upon its own initiative without complaint, establish through routes, joint classifications, the joint rates, fares, or charges, applicable to the transportation of passengers or property by carriers subject to this chapter, * *.
It is not disputed, however, that these provisions do not enable the Commission to require Northern Lines to grant trackage rights into Portland and Billings as required in the conditions attached to approval of the merger; so, it seems clear, the full benefits of the merger in strengthening Milwaukee could not be obtained as suggested by the Department. As to the other arrangements which the Department says the Commission could require without merger, the Commission itself disclaims such authority, relying upon its own construction of its powers. For this position it enlists some support from Chicago, M., St. P. & P. R. Co. (Milwaukee) v. United States, 366 U.S. 745, 81 S.Ct. 1630, 6 L.Ed.2d 772; Thompson v. United States, 343 U.S. 549, 72 S.Ct. 978, 96 L.Ed. 1134; and United States v. Great Northern R. Co., 343 U.S. 562, 72 S.Ct. 985, 96 L.Ed. 1142. The Department thus rests its position upon a construction of the statute which the Commission considers erroneous and opposes.
*868 Were the Commission to overcome its opposition and seek to require Northern Lines to make the arrangements under statutory authority independently of that used in approving the merger it is probable the matter would become involved in protracted proceedings, including litigation, with the outcome quite uncertain. In this situation we do not deem it essential for the court to make a definitive decision as to the correctness of the Department's position; for it is clear the conditions for improvement of Milwaukee in its competitive position with Northern Lines can be accomplished now as the Commission requires. This seems the most certain and expeditious manner of doing so, if not the only manner. Moreover, the question in the end is whether the merger is in the public interest. The strengthening of Milwaukee is quite relevant to that question. In its strengthened position, Milwaukee on its part would assure greater intramodal competition. If it were strengthened independently of the merger, as the Department suggests should have been done, the issue of the public interest, though made simpler, would still exist in the merger proceedings. Assuming that the Commission attributes to the conditions strengthening Milwaukee benefits which arise from approval of the merger, the fact that some of those benefits might possibly otherwise have been obtained hardly detracts from the actual advantage of the present conditions, if, as we believe, they give support to the Commission's finding that the merger is consistent with the public interest.

CompetitionIntermodal.
This brings us to a fuller consideration of intermodal competition. As we have seen, the Commission referred to the construction of new superhighways and pipelines and to improvements in waterways. These developments, in view of the Commission, presage a competitive future even more intense than the present. The Commission concluded that applicants are faced not only with growing intermodal competition but are losing to competitors a steadily increasing share of the transportation market. While it states that applicants have enjoyed a moderate success, "increasing competition and an inability to prevent traffic erosion make it necessary that applicants take measures now to assure continued success in the future." They seek this through the merger, leading to a "more efficient transportation plant capable of meeting competition as well as providing equal and in many respects, improved service to the public." 331 I.C. C. 260.
This is a different conclusion from that reached in the First Report. We bear in mind, however, that the Second Report is now the critical one. In it intermodal competition assumes a dual significance. First, it was found that the savings and increased physical resources of the merged lines would enable New Company to run a more efficient transportation system so as to compete better with other modes. It is not contended that New Company, given its estimated savings, will not be able to offer improved service. Secondly, it was concluded that the elimination of competition between Northern Lines in the Northern Tier was not of overriding importance due to the presence of vigorous intermodal competition. The First Report's finding does not invalidate the conclusion in the Second Report. There is ample evidence in the record that motor carriers are reasonable substitutes for railroads in many instances. Numerous witnesses, principally shippers, described substantial incursions by motor carriers into railroad traffic in paper products, steel, cement, fruit, grain, et cetera. See, e. g., Tr. 5754, 11836, 9527, 7224, 8023, respectively. Nor is the long haul the sanctuary of the railroad. The average length of haul of Class I motor carriers operating in the merger territory in 1959 was 402 miles, as compared with 381 miles for Great Northern and 462 miles for Northern Pacific. Tr. 523; Transport Statistics in the United States, 1959, Section A-1, Statistics of Rail-Line Operations (Bureau of Accounts, I.C.C.). Among the 248 Class I *869 motor carriers serving the merger territory, there are two major coast-to-coast trucking concerns operating at virtually every major terminal served by applicants. Ex. 17. New interstate highways between Chicago, Twin Cities, and Seattle will make the Twin Cities-Seattle truck route 241 miles shorter than the Northern Pacific track. The same highway will reduce truck travel time to 36 hours as compared with 43½ hours, the fastest rail freight time. Tr. 516, 1474. Applicants proffered substantial evidence as to the rapid growth of motor carriers in the merger territory in terms of revenue, tonnage, and truck registrations. See Ex. 17, Tr. 521-525.
Shipper testimony revealed a wide range of reasons for the switch to motor carrierslower costs, better service, more flexible routing, faster delivery. The manner in which trucks have managed to undercut the railroads in one or another facet of almost every submarket illustrates the fungibility of rail and motor transport. The rapid growth of the trucking industry and incursion of motor transportation into railroad traffic of all types provide a substantial basis for the Commission's conclusion that motor carriers are ready substitutes for, and vigorous competitors with, rail transport in the Northern Tier.
The Commission's reliance on intermodel competition to justify the reduction or elimination of interrailroad competition has been judicially approved in comparable situations, see, e. g., Penn-Central Merger Cases, 389 U.S. at 501, 88 S.Ct. 602; Florida Coast Railway Co. v. United States, 259 F.Supp. at 1010, 1015-1016, and has been supported by most commentators.[16] Recent Commission merger cases have stressed "the intensive competition the railroads face today and in the future from other modes of transportation." Louisville & Nashville R. Co. Merger, 295 I.C.C. 457, 475, aff'd sub nom., City of Nashville v. United States, 155 F.Supp. 98 (M.D. Tenn.), aff'd per curiam, 355 U.S. 63, 78 S.Ct. 139, 2 L.Ed.2d 106.[17]
We conclude the above consideration of the bearing of the problem of competition on the public interest equation of the merger by stating that the significant findings and conclusion of the Commission in this matter, to the effect that the competitive situation which will result from the merger is consistent with the public interest, are supported by substantial evidence considering the record as a whole, are reasonable and are sustained.

Benefits in Savings.
The Commission in its Second Report states: "Substantial dollar savings plus an improved earning potential constitute tangible benefits which will accrue to applicants by merger." 331 I.C.C. 260. The Commission estimated the savings at about $40,000,000 annually, due principally to labor savings through reduction of the number of jobs, including the effect of consolidation of operations at various common points. A major part of the savings was to be attributed to unification of applicants' separate organizations at the levels of administration, operation, maintenance, *870 traffic, and others. The Commission relied primarily upon a study and report by Wyer, completed in 1957, revised in 1960, updated in 1965, and supplemented by Wyer's testimony at the rehearing in 1967.
The Commission related the savings to the resulting improved financial posture of applicants and the ultimate issue of the public interest. This improved financial posture, the Commission found,
[W]ill enable applicants to become stronger and more stable, and thus be better equipped to meet the growing competition now being felt. Moreover, consolidation of facilities, elimination of wasteful duplication, improved routing, better car fleet utilization, and avoidance of time-consuming interchanges among applicants will result in a more efficient railroad. Such achievements clearly are consistent with the public interest. 331 I.C.C. 263.
The First Report discounted by one-third savings estimated at approximately $15,000,000 attributable to "common points" because they "could be realized without merger." 328 I.C.C. 503. In the Second Report these savings were estimated at about $18,000,000, and the Commission concluded that such savings (including the discounted percentage) could not be realized without merger because of the unequal benefits accruing to the respective applicants as a result of consolidations at common points. The findings in the First Report are not binding. The relevant test is substantial evidence to support the present findings. The situations cited in the First Report as instances of successful joint operations without merger were more or less unique. We cannot overrule the Commission's final conclusion that coordination on the contemplated scale is physically impossible absent merger.
The Department of Justice urges that the savings projected by the Commission are excessive because of alleged errors in the Wyer method of updating the savings due to job eliminations. In giving his figures at the 1967 hearing, Mr. Wyer was subjected to extensive cross-examination. His testimony and accompanying tabulations and analyses, while we cannot say they lead to a precise amount to be accepted as correct, on the whole furnish substantial evidence to support the savings as found by the Commission. The findings are not tied to a precise amount:
As is implied above the exact amount of merger savings cannot be precisely determined under any circumstances. Here, we are convinced that they would be substantial and of sufficient amount to justify the merger, both in terms of enabling the merged company to improve its service to the public and of providing a return on investment more nearly commensurate with the investment requirements of a viable and progressive transportation system. 331 I.C.C. 264.
And see, Erie-Lackawanna R. Co. v. United States, 279 F.Supp. 316, 343 (S.D.N.Y.), aff'd sub nom. Penn Central Merger Cases, 389 U.S. 486, 88 S.Ct. 602, 19 L.Ed.2d 723.
With this basic conclusion of the Commission, and with very substantial savings not left in doubt, attacks upon the Wyer updating methodology, not ignored by the Commission, by no means persuade us that we should either remand for further hearings on this subject, or disapprove the merger.[18] The *871 Commission explicitly recognized that the level and consist of employment on the railroads are changing constantly and took this into consideration in reaching its final judgment about labor cost savings, a judgment supported by substantial evidence to which the Commission's reasoning was applied:
Thus, in the present proceeding, we are convinced that labor cost savings, in the approximate magnitude discussed elsewhere in the report, will occur. Moreover, in our judgment the likelihood that the Department would have been able to show otherwise through the discovery or further hearing procedures which it sought, was not sufficiently great to justify any additional time and expense in this already prolonged proceeding. 331 I.C.C. 264.

The Stock Exchange Ratio.
By Section 5(2) (b) of the Act the Commission in authorizing a merger may provide such terms and conditions as it finds to be "just and reasonable." One of the present terms and conditions makes provision for the ratio of stock exchange. See Schwabacher v. United States, 334 U.S. 182, 68 S.Ct. 958, 92 L.Ed. 1305; Friedman v. United States, 168 F.Supp. 815, 818 (S.D.N.Y.), aff'd per curiam, 359 U.S. 205, 79 S.Ct. 738, 3 L.Ed.2d 759; Stott v. United States, 166 F.Supp. 851 (S.D.N.Y.). The Commission decided that the stock of New Company would be exchanged with the stockholders of the respective Northern Lines as follows:
Northern Pacific stockholders would receive common stock on a share for share basis. Great Northern stockholders would receive stock on a share for share basis plus one-half share of New Company's $10.00 par value 5½ percent preferred stock for each share of Great Northern stock held at the date of the merger.[19] The preferred stock is to be *872 retired, through the operation of a mandatory sinking fund, over a 25 year period beginning at the fifth anniversary of the merger. Also, the preferred stock would be redeemable at the option of New Company after the fifth anniversary in a manner not separately opposed.
The present opposition to the exchange ratio is advanced by The Northern Pacific Stockholders Protective Committee, to be referred to as the Committee. It appears to represent some 3 percent of Northern Pacific stockholders holding about 5 percent of the stock of that company. We review first the manner in which the Commission arrived at the exchange ratio. We then consider the Committee's objections.
The officials of the companies, advised by experts, began discussions as early as 1955, and thenceforth engaged in extensive negotiations seeking agreement in this matter. A very important problem in determining the ratio resides in the extensive land holdings of Northern Pacific, with their values in timber, oil, gas and other minerals. This company's over-all financial advisor was Morgan-Stanley & Company, which probed various aspects of the problem deemed by these experts to be relevant. The financial adviser to Great Northern was the First Boston Company. An expert jointly available was Wyer. At a certain point in the negotiations agreement between the officers of the two companies was reached to the effect that on the basis of railroad earnings Great Northern would contribute 60 percent of the value of New Company to 40 percent contributed by Northern Pacific. The Committee does not question these figures. The negotiations then were devoted to seeking agreement as to treatment of the natural resources.
There was exploration of an approach by which two classes of stock would be issued by New Company, one to Northern Pacific stockholders alone from which they would derive income only from Northern Pacific's natural resources. The difficulty New Company would encounter in administering the two classes of property, with stockholders having divergent interests, opposed this possible solution. Another possibility was to spin off from its other properties the natural resource properties of Northern Pacific. This was rejected because a spin-off free of encumbrances would create problems with mortgage trustees and bond holders, with the prospect of extended litigation and the probability that it could never be consummated successfully; and if a spin-off were subject to the mortgages there would be prohibitive tax consequences. Northern Pacific concluded that the natural resource properties would have to be included in the merger.
Great Northern's proposals rested in good part upon its greater earning power to be contributed to New Company. Northern Pacific finally acceded to the need to abandon its claim of full equality and to give Great Northern stockholders full recognition for a time at least of that company's greater earning power. After prolonged discussions the companies agreed to the terms of the stock exchange ultimately approved by the Commission. It had been approved by the consultants of both companies, Morgan-Stanley for Northern Pacific and First Boston Corporation for Great Northern. It was also approved by applicants' respective Boards of Directors and stockholders.
The Commission, however, based its approval upon an independent determination, considering the prolonged negotiations involving arms length bargaining as evidence of fairness in the exchange ratio and concluding that the ratio reflected fairly the contributions of each group of stockholders to the combined system.
The Committee conceded that a definitive valuation would be difficult if not impossible. The Commission pointed to the fact that the Committee's real objection was to the inclusion of the natural resources and not to undervaluation of them. The Commission concluded the Committee's position was "contrary to the record, which shows that the full *873 potential value of the natural resources properties was fully reflected in the shares allotted to the Northern Pacific stockholders." 331 I.C.C. 259.
This whole matter, including the views advanced by the Committee, was explored in great detail by the Commission. On the basis of the record upon which the Commission relied, we have no reason to rule other than that the ratio which was established, with approval of the companies and of a large majority of their stockholders, is just and reasonable. Moreover, we do not agree that the Commission should be required to reopen the record to update it. We think that such fluctuations as the Committee refers to as possibly relevant are, as the Commission now urges, those normal fluctuations which can be expected to occur during the course of any protracted administrative proceeding and which have no effect upon the ultimate fairness of the Commission's finding. The arguments pro and con reopening cancel out each other sufficiently to leave the discretion exercised by the Commission free of abuse. United States v. Pierce Auto Freight Lines, 327 U.S. 515, 534-535, 66 S.Ct. 687, 90 L.Ed. 821.
In conclusion on this branch of the case, although we have not specifically discussed each of the arguments advanced by the Committee, we think all significant issues regarding the ratio were fully considered and decided in a manner which requires the court to withhold any direction of its own that the ratio should be different.[20]

The Alleged Agreement of Burlington Not to Seek Entrance to the City of Milwaukee.
As has been said the applicants, after the First Report's disapproval of the merger, entered into separate agreements with Milwaukee and North Western to meet conditions the absence of which had led Milwaukee and North Western originally to oppose the merger and in part had led the Commission to disapprove it. The substance of these agreements is now required by the Commission to be met as conditions accompanying its approval. North Western withdrew its opposition and urged approval, and Milwaukee now actively supports approval of the merger. In connection with all this, applicants have undertaken not to contest the pending merger of Milwaukee and North Western. The Department of Justice considers that these arrangements have been made to further the private interest of the railroads, to the detriment of the public interest. Moreover, the Department refers to a serious possibility, which it unsuccessfully sought to have the Commission explore, that the Milwaukee (and the North Western as well) withdrew its opposition to this merger in return for the Burlington's promise not to seek a condition in the North Western-Milwaukee proceeding giving Burlington entry into the City of Milwaukee. We accept the Commission's treatment of the matter, as follows:
Justice views such an arrangement as an objectionable attempt by these carriers to compromise their differences at the expense of the general public, and to effect a restructuring of railroad alignments in the West with no regard for the public interest and in derogation of our statutory authority. Our duty under section 5 is to examine the proposal to determine whether it is consistent with the public interest. The fact that C&NW and the Milwaukee withdrew their opposition following the agreement does not delete from the record nor detract from the significance of the evidence they presented in opposition to the Northern Lines proposal. It is that record, as amplified on limited further hearing, and not the agreement, which justifies the result reached after reevaluation. We have the power to require protective conditions, whether agreed to or not, when the public interest demands. *874 Accordingly, the fact that the parties may have reached an agreement in no way relieves us of our statutory duty. We approach the case in that light without regard to alleged motivation of the parties. 331 I.C.C. 243.
As to the alleged undertaking of Burlington not to seek entrance into the City of Milwaukee we think the Commission was not required because of this to enlarge the scope of the limited further hearing. The question whether the present merger is consistent with the public interest must be determined independently of any such undertaking. Burlington, in the Milwaukee-North Western proceeding, has denied any such agreement; but if it were made it does not affect the power of the Commission to require Burlington to disregard such an undertaking should the Commission deem it in the public interest in either the Milwaukee-North Western proceedings or in these Northern Lines proceedings. See Condition 33 of the Commission's Order. 331 I.C.C. 359, as modified, 331 I.C.C. 879. In determining whether to require such action by Burlington, the Commission must act strictly in the public interest, uninfluenced by any such undertaking, if such there be. See B. & O. R. Co. v. United States, 386 U.S. 372, 436-437, 87 S.Ct. 1100, 18 L.Ed.2d 159, concurring opinion of Mr. Justice Brennan; Interstate Commerce Commission v. Chicago, Rock Island & Pacific Ry. Co., 218 U.S. 88, 103, 30 S.Ct. 651, 54 L.Ed. 946. The Department does not allege that the suspected undertaking is in violation of law.

The Question of Consolidation of Western Railroad Mergers with the Northern Lines Proceeding.
The Denver & Rio Grande Western Railroad Company, after the Commission's limited further hearing on reconsideration of the applications, petitioned the Commission to be allowed to present evidence on the over-all effects and cross effects of this and two other pending mergers.[21] Rio Grande also sought a withholding of decisions in this proceeding, as well as in the others, pending determination of the effects of the proposals. In denying a further hearing the Commission nevertheless recognized the importance of the effect of its decision upon the general railroad structure in the west.[22]
In the event the Commission should find other pending unifications to warrant approval, it decided to meet the problem by the exercise of its broad power to relate the pending applications to other proposals, while at the same time moving this proceeding forward in a manner deemed best to protect the public and competing rail carriers. It was decided that consolidation of the cases was unworkable and that final decision in each case should not be withheld until all were ready for decision.
We have pointed out that the Commission reserved jurisdiction for a period of five years in order to impose such just and reasonable conditions as may be necessitated by any cumulative or crossover problems stemming from approval of this merger and any other transaction authorized under Section 5 with respect to the territory involved, citing B. & O. *875 R. Co. v. United States, 386 U.S. 372, 387, 87 S.Ct. 1100, 18 L.Ed.2d 159. Jurisdiction was retained for a like period of five years in order to enable the Commission to consider among other things petitions under Section 5(2) (d) of the Act by any railroad in the territory involved requesting inclusion in the merger authorized. Moreover, the Commission decided that consummation of the merger would constitute irrefutable assent by applicants to the reservation of power by the Commission to impose, after hearing, such just and reasonable conditions as may be necessary and appropriate.
In its April 11, 1968, Second Report on Reconsideration, the Commission went further. Referring to the delays incident to court litigation and other factors in connection with merger proceedings but at the same time not overlooking the fact that cross-over effects, if any, would not come into being until after consummation of one or more of the proposed mergers, the Commission modified the provision for five-year retention of jurisdiction by reserving jurisdiction to alter that period if and when it is shown to be necessary or appropriate so that the period would be "5 years or such other period as the Commission may, for good cause shown, hereafter prescribe." 331 I.C.C. 879. The Commission stated that this would not impose an undue burden on applicants or render the merger in any way inconsistent with the public interest and that at the same time it would further the congressional policy toward consolidation of the Nation's railroads. See Brotherhood of Railroad Maintenance Employees v. United States, 221 F.Supp. 19, 30 (E.D.Mich.), aff'd per curiam, 375 U.S. 216, 84 S.Ct. 341, 11 L.Ed.2d 270. Apparently satisfied with the situation as it thus developed Rio Grande does not press in court any objection to the merger of the Northern Lines.
Our position is that we find no solid basis for concluding that the discretion exercised by the Commission is unreasonable. There are such cases, as illustrated by the Supreme Court's remand in B. & O. R. Co. v. United States, supra, where failure to afford protection for other railroads would be fatal to final approval of the merger. No showing is made in the present case of a comparable situation.[23] The manner in which the Commission moved forward while at the same time providing for readjustments in the light of the over-all situation in the territory affected as it might develop seems to the court to be reasonable in pursuit of the public interest as represented by the national transportation policy.

Contentions of the State of Washington.
The State of Washington contends against the merger on the basis of a provision of her constitution, article XII, section 16, prohibiting consolidation of the stock, property, or franchises of competing railroads within the State. All else aside this provision must give way to the federal power to regulate commerce among the States, which is the basis for the Act the Commission has administered in this case. That Act provides inter alia that carriers which merge with Commission's approval are relieved from the operation not only of federal antitrust laws but of all prohibitions of State law. 49 U.S.C. § 5 (11), note 6, supra. Schwabacher v. United States, 334 U.S. 182, 193-197, 68 S.Ct. 958, 92 L.Ed. 1305; Seaboard Air Line R. Co. v. Daniel, 333 U.S. 118, 126, 68 S.Ct. 426, 92 L.Ed. 580.
In other significant respects contentions of the State of Washington overlap *876 those considered in portions of this opinion which concern the strengthening of the Milwaukee, the savings attributable to the merger, and the over-all competitive situation, both intramodal and intermodal.

Contentions of the City of Auburn, in Western Washington.
Auburn fears that it would be eliminated as a transcontinental freight origination and termination point with the result that the Northern Pacific yard there would be closed. Though it is not certain this would in fact occur,[24] it is said that about half of the 500 Auburn residents employed at the yards would lose their employment and the balance would be obliged to move elsewhere if they wished to retain a job, with substantial economic loss to Auburn. None of the employees of the Northern Lines join Auburn in urging disapproval of the merger. Satisfactory arrangements have led to withdrawal of employee opposition. The Commission considered Auburn's position in the context of the whole problem. The possible adverse economic effect upon the city was thought not to justify withholding the benefits of approval. On the whole case this is a reasonable judgment of the Commission which we accept.

Contentions of the Board of Railroad Commissioners of the State of Montana, referred to as Montana.
Montana pursues contentions, sponsored also by the Department of Justice, regarding the effect of the merger on competition, which we need not discuss anew, believing that we have already sufficiently enlarged upon our views. Montana also warns against attaching weight to approval of the merger by various elements within the States; but its principal contentions, other than with respect to the competitive situation, are against the Commission's approval of certain inter-railroad stipulations between New Company and Western Pacific, Southern Pacific and the Santa Fe, and acquisition by New Company of the properties of motor carriers owned by Burlington, Northern Pacific and Great Northern.
On a record in which they are incorporated the Commission described the stipulations as
[B]asically the standard routing conditions tailored to the specific situations involved, [representing] the voluntary action of free parties, each looking to its reasonable interests and those of its patrons and markets.
In our opinion, these stipulations are indeed in the public interest and should be approved.
331 I.C.C. 282.
We defer to the judgment of the Commission after its full consideration of the stipulations in its Second Report, preceded by the Examiner's approval and the Commission's in its First Report. See 328 I.C.C. 480. The record, aided by the expertise involved, precludes a ruling by the court now that approval of the stipulations is unsupported by the requisite evidence or is otherwise invalid.
As to the problem of motor carriers Montana states that the Act, 49 U.S.C. § 5(2) (b), provides that if a carrier by railroad is an applicant in a case which involves a motor carrier, "the Commission shall not enter such an order unless it finds that the transaction proposed will be consistent with the public interest and will enable such carrier to use service by motor vehicle to public advantage in its operations and will not unduly restrain competition." Montana contends that the findings thereby required were not made and that those made are not supported by requisite evidence.
Montana seems to overlook the findings of the Second Report, 331 I.C.C. 290, not only as to the public interest but also that the proposed transaction "will enable the Great Northern Pacific and Burlington Lines, Inc., as in the case *877 of its predecessors in interest, to use service by motor vehicle to public advantage in its rail operations, and will not unduly restrain competition."
The details of the motor carrier operations are disclosed in the record. The Commission made findings that each subsidiary motor carrier would continue to operate its own equipment under its own authority and over its own routes, no new motor carrier network would be created, and the only change would be in ownership, that is, New Company in lieu of the individual applicants, with no adverse effect on competing motor carriers. The evidence in the record with respect to the details of these matters support the conclusional factual findings of the Commission.

Contentions of Livingston Anti-Merger Committee.
The principal contention of the Committee seeks to raise for decision within the merger case a title case of great magnitude. The Committee contends that the history of the title to the properties now in Northern Pacific Railway Company, beginning with the Act of Congress of July 2, 1864 (13 Stat. 365) incorporating the "Northern Pacific Railroad Company," shows that the acquisition in 1896 of the properties by Northern Pacific Railway Company by foreclosure proceedings was invalid. This history is long in time and complicated in nature. After reviewing it with aid of the briefs we conclude the Commission did not err in refusing to disapprove the merger because of the Committee's challenge. In United States v. Northern Pacific Ry. Co., 311 U.S. 317, 328, 61 S.Ct. 264, 269, 85 L.Ed. 210, though the litigation involved other issues, the Supreme Court in 1940, in tracing the title of Northern Pacific, said:
The corporation chartered by Congress [the Railroad Company] operated the road until receivers were appointed in 1893. Pursuant to foreclosure proceedings the Northern Pacific Railway Company [the applicant] acquired title to the railroad, the land grant, and all other property of the original corporation and has since operated the road and obtained patents for millions of acres under the land grants.
And see Northern Pacific Ry. Co. v. Boyd, 228 U.S. 482, 502, 33 S.Ct. 554, 57 L.Ed. 931, holding the foreclosure sale binding between the parties though not against the creditor Boyd; Landell v. Northern Pacific Ry. Co., 122 F.Supp. 253 (D.D.C.), where it is held that laches barred the effort there to upset Northern Pacific's title, aff'd, 96 U.S.App.D.C. 24, 223 F.2d 316, cert. denied, 350 U.S. 844, 76 S.Ct. 85, 100 L.Ed. 752. And see the opinion of Attorney General Judson Harmon, 21 Op.Atty.Gen. 486 (1897), and that of Attorney General W. H. Moody, 25 Op.Atty.Gen. 401 (1905). Mr. Moody became an Associate Justice of the Supreme Court. The Commission was not required to relitigate the issue or to withhold approval of the merger pending possible new litigation over Northern Pacific's title. For purposes of merger proceedings it could rely on the existing judicial records in that regard, supplemented by the opinions of two Attorneys General. Should these old problems engage the judiciary again in separate litigation placing Northern Pacific's title in issue, and any different result eventually be reached from that heretofore recorded, the effect on the merger in its then status would be for the judiciary to resolve in its decree in that litigation.

Conclusion.
To explain in a manner to carry conviction to all concerned the decision of so intricate a case is perhaps impossible. The merger, its accompanying conditions and its related transactions will bring about changes in vast enterprises which took over from the pony express, the stagecoach and the covered wagon.[25] The romance of railroad building is all but lost in the welter of data in the record before us, which has been sculptured *878 into positions which are not adhered to with unanimity by all affected. Great expectations of an earlier era became modified by the impact of events. More rails were laid than need required as matters developed, or so it is claimed. Only time and experience can tell with greater certainty whether this is so. The Commission's present judgment, however, is not for that reason to be voided.
We think the orders in suit, considered under the criteria respectively applicable to the Commission and to this court, see Penn-Central Merger and N & W Inclusion Cases, supra at 498-499, 88 S.Ct. 602, withstand the challenges of the litigation.
The complaints accordingly will be dismissed and the orders of the Commission will be affirmed. Our order will be stayed for fifteen (15) days from its date. If within that period notice of appeal to the Supreme Court is filed and an application for further stay is made to that Court our stay will stand enlarged until determination of such application or other order of the Chief Justice of the United States, or of an Associate Justice of the Court, or of the Court itself.[26]
NOTES
[*] Serving with Chief Judge Curran as members of the District Court of three judges designated by the Chief Circuit Judge by order herein of May 10, 1968.
[1] See note 4, infra.
[2] The First Report was concurred in by a majority of six members of the Commission with five members dissenting. The orders now in suit represent the views of eight members, with two dissenting and one not participating.
[3] Intervening plaintiffs: Northern Pacific Stockholders' Protective Committee; City of Auburn, Washington; State of Washington; Board of Railroad Commissioners of Montana; Livingston Antimerger Committee. Intervening defendants: Great Northern Railway Company; Northern Pacific Railway Company; and their affiliates Chicago, Burlington & Quincy Railroad Company; Pacific Coast R.R. Co.; Spokane, Portland and Seattle Railroad Company; and Great Northern Pacific & Burlington Lines, Inc.; other intervening defendants: Chicago, Milwaukee, St. Paul & Pacific Railroad Company; 230 Pacific Northwest Shippers.
[4] After this case was filed but before submission of the case for decision by this court the Commission under date of June 17, 1968, on reconsideration of its report and order of April 11, 1968 made what is designated as a "Third Report of The Commission on Reconsideration" embodying the Commission's construction of certain conditions contained in Appendix L of the report and order of November 30, 1967, as modified, particularly with respect to Condition 23. None of the parties has raised any question about this Third Report and we assume it is not independently contested.
[5] "Finance Docket No. 21478,1 Great Northern Pacific & Burlington Lines, Inc.Merger, etc.Great Northern Railway Company, et al."

1. This report also embraces Finance Docket No. 21479, Chicago, Burlington & Quincy Railroad Company, et al.Stock Issuance, et cetera, and Finance Docket No. 21480, Great Northern Pacific & Burlington Lines, Inc., et al.Construction and Abandonment.
328 I.C.C. 460; 331 I.C.C. 228; 331 I.C.C. 869; 333 I.C.C. 391.
[6] This Section sets forth in its subdivision (2) (a) the lawfulness of mergers approved in subdivision (b). The latter among other things sets forth the standards to be followed by the Commission in determining whether to approve:

* * * If the Commission finds that, subject to such terms and conditions and such modifications as it shall find to be just and reasonable, the proposed transaction is within the scope of subdivision (a) of this paragraph and will be consistent with the public interest, it shall enter an order approving and authorizing such transaction, upon the terms and conditions, and with the modifications, so found to be just and reasonable; * * *
Subdivision 2(c) provides:
(c) In passing upon any proposed transaction under the provisions of this paragraph, the Commission shall give weight to the following considerations, among others: (1) The effect of the proposed transaction upon adequate transportation service to the public; (2) the effect upon the public interest of the inclusion, or failure to include, other railroads in the territory involved in the proposed transaction; (3) the total fixed charges resulting from the proposed transaction; and (4) the interest of the carrier employees affected.
Section 5 further provides in subdivision (11):
The authority conferred by this section shall be exclusive and plenary, and any carrier or corporation participating in or resulting from any transaction approved by the Commission thereunder shall have full power * * * to carry such transaction into effect and to own and operate any properties and exercise any control or franchises acquired through said transaction without invoking any approval under State authority; and any carriers or other corporations, and their officers and employees and any other persons, participating in a transaction approved or authorized under the provisions of this section shall be and they are relieved from the operation of the antitrust laws and of all other restraints, limitations, and prohibitions of law, Federal, State, or municipal, insofar as may be necessary to enable them to carry into effect the transaction so approved or provided for in accordance with the terms and conditions, if any, imposed by the Commission, and to hold, maintain, and operate any properties and exercise any control or franchises acquired through such transaction. Nothing in this section shall be construed to create or provide for the creation, directly or indirectly, of a Federal corporation, but any power granted by this section to any carrier or other corporation shall be deemed to be in addition to and in modification of its powers under its corporate charter or under the laws of any State.
[7] Among those transactions were the issuance of certain securities and the assumption of obligation and liability in respect of securities under Section 20a of the Act and the obtaining of certain extensions and abandonments of railroad lines under Sections 1(18) to 1(20), inclusive, of the Act.
[8] A petition was simultaneously filed by Northern Pacific Stockholders' Protective Committee (NPSC), intervener before the Commission, seeking further hearings with respect to the justice and reasonableness of terms and conditions of applicants' merger agreements. A petition was also filed by The Denver and Rio Grande Western Railroad Company (Rio Grande or DR & W), one of the railroads receiving protective conditions, seeking an investigation into the agreements entered into by applicants with Milwaukee and the Chicago and North Western Railway Company (North Western or NW). Applicants replied to these petitions, and the Commission received from numerous parties replies to applicants' petitions.
[9] The Colorado and Southern Railway Company (C&S) and Fort Worth and Denver Railway Company (FW&D), both controlled by Burlington.
[10] See note 9, supra.
[11] RLEA sought protective conditions to cover all employees, of all carriers, adversely affected by the merger. The Commission responded:

As found in the Seaboard-Coast Line case, employees affected are those of the carriers involved in the merger and most immediately affected thereby. Our discussion and conclusions herein should be viewed in that context.
331 I.C.C. 276. The Commission's position in Seaboard Air Line R. Co. MergerAtlantic Coast Line, 320 I.C.C. 122, was affirmed. Florida East Coast Ry. Co. v. United States, 259 F.Supp. 993, 1019 (M.D.Fla.), aff'd per curiam, 386 U.S. 544, 87 S.Ct. 1299, 18 L.Ed.2d 285.
[12] Called the Rock Isand case.
[13] Called the Milwaukee case.
[14] North Western also was a vigorous objector to the merger at the time of the First Report. However, Northern Lines agreed to certain conditions deemed necessary by the Commission with respect to North Western. Summarized, they are, 331 I.C.C. 280:

1. Establishment of through routes and joint rates via the new gateway of Crawford, Nebr., on all traffic interchanged at such junction between NuCo and North Western.
2. Establishment of through routes and joint rates via the new gateway of Oakes, N.Dak., on all traffic interchanged at such junction between NuCo and North Western.
3. Improved interchange at Minneapolis, Minn., through operational conditions.
4. Cancellation of North Western rental obligations for tracks and facilities not used after unification and sale or lease of Union Yard trackage to North Western.
5. Improvement in North Western interchange at Head-of-the-Lakes, with Duluth, Winnipeg and Pacific Ry. Co. (DW&P).
We note that North Western is not in present or potential competition with applicants, individually or merged, in the Northern Tier States but that protective conditions benefiting North Western are also important to the ultimate issue of public interest.
[15] We note the Commission's statement that "a properly conditioned merger, with NuCo competing against a strengthened Milwaukee, with serve to enhance competition. * * *" 331 I.C.C. 275. This is to be read in context, with the full discussion of the effect of the merger on competition. It is not properly to be interpreted as a finding of an over-all enhancement of competition but rather as an enhancement of the competitive situation of Milwaukee in relation to Northern Lines. It was, of course, recognized that competition between the latter would be eliminated. In its "Summary," 331 I.C.C. 289, the Commission set forth reasons why "this merger can lead to the creation of meaningful rail competition, through strengthening the Milwaukee and the NW, as well as making the combined applicants a more proficient transport agency." No final conclusion of the Commission rests upon a finding by it that competition after would necessarily be greater than before the merger.
[16] Phillips, Railroad Mergers: Competition, Monopoly and Antitrust, 19 Wash. & Lee L.Rev. 1, 17 ("so long as the public has a choice of transportation, the elimination of interrailroad rivalry cannot be equated with the elimination of competition"); Fulda, Competition in the Regulated Industries: Transportation 52 ("the relevant market is now predominantly the market for transportation services rather than railroad services").
[17] See also Virginian R. Co. Merger, 307 I.C.C. 401, 416; Erie R. Co.Merger Delaware, Lackawanna & Western Railroad Co., 312 I.C.C. 185, 246-47, complaint dismissed, Brotherhood of Maint. of Way Employees v. United States, 189 F.Supp. 942 (E.D.Mich.), aff'd per curiam, 366 U.S. 169, 81 S.Ct. 913, 6 L.Ed.2d 206; Chicago & N. W. R. Co.Purchase Minneapolis & St. L. R. Co., 312 I.C.C. 285, 296-97; Seaboard Air Line R. Co. MergerAtlantic Coast R. Co., 320 I.C.C. 122, 149-53; aff'd sub nom., Florida East Coast Railway Co. v. United States, 259 F.Supp. 993 (M.D.Fla.), aff'd per curiam, 386 U.S. 544, 87 S.Ct. 1299, 18 L.Ed.2d 285.
[18] Before the Commission and in court the Department pressed its requests for discovery and/or a broader hearing involving intervening changes bearing upon labor savings. The Commission, in adhering to its limited further hearing, stated:

We are well aware that the technological and operational improvements on the Nation's railroads have brought about a reduction in the number of railroad employees and a redistribution in the consist of the rail labor force. This has been true in varying degrees throughout the railroad industry. We realize these processes do not stop simply because a transaction has been proposed under section 5(2) (d) or mark time while we and the courts take evidence and consider the views of all of those who are concerned with the structuring of the Nation's railroad system. Because of the complexities of rail mergers and the demands of due process, administrative consideration of these cases consumes substantial periods of time. But there comes a point at which we must honor our concomitant obligations to complete our proceedings upon a rail merger application within a reasonable time. Most crucial, as the courts have recognized repeatedly, is the point at which we are confronted with petitions for reopening and rehearing in proceedings which already have been pending, sometimes for years with potential judicial review waiting beyond. See Interstate Commerce Commission v. Jersey City, 322 U.S. 503, 514, 64 S.Ct. 1129, 88 L.Ed. 1420 (1944); and cf. Florida East Coast R. Co. v. United States, 242 F.Supp. 14, reversed per curiam sub nom. Seaboard Air Line Co. v. United States, 382 U.S. 154, 86 S.Ct. 277, 15 L.Ed.2d 223 (1965); Florida East Coast R. Co. v. United States, 259 F.Supp. 993 (1966), affirmed per curiam, 386 U.S. 544, 87 S.Ct. 1299, 18 L.Ed.2d 285; the Seaboard-Atlantic Coast Line merger application was filed with the Commission on July 22, 1960, and the administrative and judicial review proceedings were completed on April 19, 1967.
It is in this context that we have considered the Department's contentions. As we have recognized above, the level and consist of employment on the Nation's railroads are changing constantly. We assume that the length of the proceedings on any significant rail merger application means that by their completion it can be shown that the estimated savings at some points or in some operations have been overtaken or outdated by technological change. Similarly, we recognize that our permissive order approving a merger does not require that it be effectuated in terms of every savings-producing change visualized by a management consultant. Rather, we recognize that with the passage of time, when an approved merger finally is consummated, it will realize savings which were not anticipated, while other anticipated savings are not achieved. * * *
331 I.C.C. 263-64.
[19] The Burlington stock owned by Great Northern and Northern Pacific, totalling 97.18 percent of the total outstanding Burlington stock, will be canceled but the minority stockholders of Burlington will receive 3.25 shares of common stock in New Company in exchange for each share of their Burlington Stock.
[20] The Commission advised that as of March 14, 1968, 73.20% of Northern Pacific's stockholders voted in favor of the merger, 2.57% against.
[21] These were proposals involving the Chicago and North Western Railway CompanyControlChicago, Rock Island & Pacific Railroad Co., the Rock Island case, the Chicago, Milwaukee & North Western Transportation CompanyConsolidation Chicago & North Western Railway Co., and Chicago, Milwaukee, St. Paul & Pacific Railroad Company, the Milwaukee case. Finance Docket Nos. 22688 and 24182.
[22] The Commission stated: "The Rio Grande request places in sharp perspective the important question of what will be the effect of our decision here upon the general railroad structure in the West generally in the event other pending western rail unifications should later also warrant our approval. While we will not follow the course of action proposed by Rio Grande, we will herein provide an effective procedure by which that impact can later be measured and appropriately dealt with." 331 I.C.C. 286.
[23] With respect to a like contention urged by Soo in opposition to the merger of the North Western and the Chicago & Great Western Railway Company, Commission treatment, similar to that involved herein, was upheld: "Concerning these facts and that the Supreme Court has not held that the Commission must consolidate all current and related merger proceedings, we hold that it was not an abuse of discretion to refuse to do so here." Soo Line Railroad Company v. United States, 280 F.Supp. 907, 913,
[24] The President of Northern Pacific filed an affidavit in Auburn's suit against the United States [(W.D.Washington) Civil No. 7706, filed May 3, 1968] to the effect that the Auburn yard would be maintained.
[25] The pony express carried the mail from St. Joseph to Sacramento.
[26] See Erie-Lackawanna R. R. Co. v. United States, D.C., 279 F.Supp. 316, 356.